## UNITED STATES v. PRESS PUBLISHING COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 541.   Argued October 24, 1910.—Decided January 3, 1911.

The effect of § 2 of the act of July 7, 1898, c. 576, 30 Stat. 717, was to incorporate the criminal laws of the several States in force July 1, 1898, into the statute and make such criminal laws, to the extent of such incorporation, laws of the United States and applicable to the United States reservations within the States (*Franklin* v. *United States*, 216 U. S. 559); but the history of the act demonstrates that in its adoption, Congress sedulously considered the two-fold character of our constitutional government with the purpose of interfering as little as might be with the authority of the States, as to the subject-matter of the statute, over territory situated, except for the existence of a United States reservation, within state jurisdiction.

The purpose and intent leading to the adoption of an act affords a means for discerning the intent of a subsequent act relating to the same subject and superseding the earlier act.

Proceedings in Congress in the course of adoption of a statute and amending its form as originally proposed considered, in this case, in determining the purpose and scope of the act and the intent of Congress in adopting it.

VOL. CCXIX—1                                  (1)

The assimilative crimes act of 1898 cannot be used as a means for frustrating the laws of the State, within which a reservation of the United States is situated; and one accused of a crime consisting of several elements treated as a unit by the state law so that there can be but one trial and conviction thereunder cannot be indicted and tried in the United States court for a single separate element committed on such reservation, the other elements of the crime being committed in other portions of the State.

As the law of New York results in the unity as one criminal act of the publication of a libel and its circulation, allows but a single conviction for the combined act, and affords adequate means for punishing such circulation on a reservation of the United States within that State; resort cannot be had to the United States court, under § 2 of the act of July 7, 1898, to punish the act of such circulation on the basis that it is a separate and distinct offense from the publication.


ON March 4, 1909, upon the assumed authority of the second section of an act of Congress approved July 7, 1898, c. 576, 30 Stat. 717, a grand jury in the Circuit Court of the United States for the Southern District of New York found a true bill against the Press Publishing Company, charging the commission of alleged criminal libels, set out in an indictment composed of fourteen counts. The asserted libels were contained in six issues of The World, a newspaper printed in the city of New York, of which newspaper the defendant in error, a New York corporation, was publisher. The first seven counts dealt with the publication of the libels by circulating copies of the newspaper containing the same within the reservation and military post in Orange County, N. Y., known as West Point. The remaining counts dealt with the publication of each of the libels by the delivery of a copy of the issue of The World containing the same to a post office inspector at his office in the Post Office Building in the city of New York. Both West Point and the Post Office Building were averred to be places within the exclusive jurisdiction of the United States. Those who were alleged in each count to have been criminally libeled were at the

time of the publications the President of the United States, the Secretary of War and certain private individuals. The alleged libelous articles related to the purchase by the United States of the Panama Canal. We need not state the contents of the articles, since in the view taken of the case we shall be only called upon to determine whether, conceding the publications to have been libelous as charged in the indictment, they constituted offenses against the United States within the purview of the act of 1898.

The case went to trial upon a plea of not guilty. The circulation of the newspapers containing the alleged libels on the military reservation and their delivery to the inspector at the post office as charged in the indictment was admitted by the defendant. The Government on the other hand admitted that all of the issues of The World newspaper referred to in the indictment were printed in the defendant's printing establishment in the city of New York and were circulated therefrom.

At the close of the evidence introduced by the Government the defendant moved to quash the indictment or to instruct a verdict of acquittal, upon the following grounds:

"First. The court has no jurisdiction in this case because there is no statute of the United States authorizing the prosecution.

"Second. The act of 1898 does not apply to the case as disclosed by the evidence.

"Third. If construed so as to cover the acts shown by the evidence, the act is unconstitutional.

"Fourth. The offense, if any, was committed wholly within the jurisdiction of the State of New York and was punishable there.

"Fifth. The defendant being a corporation is incapable of committing the offense charged in the indictment."

The court announced that it had concluded that the indictment was not authorized by the act of 1898, and therefore the motion to quash would be sustained. Be-

fore, however, any formal entry to that effect was made, in order to obviate any question of double jeopardy, upon motion of the attorney for the United States a juror was withdrawn, and thereafter a judgment was duly entered quashing the indictment, it being expressly recited in the judgment that it was based upon a construction of the statute. To review the action of the trial court this writ of error is prosecuted by the United States, under the authority of the act of March 2, 1907, c. 2564, 34 Stat. 1246.

*Mr. James C. McReynolds,* Special Assistant to the Attorney General, with whom *The Attorney General* and *Mr. Stuart McNamara,* Special Assistant to the Attorney General, were on the brief, for the United States:

For history and interpretation of the assimilative statute act of July 7, 1898, see first Federal crimes act of April 30, 1790; first assimilative statute of March 3, 1825, 4 Stat. 115, prepared by Justice Story, and construed in *United States* v. *Paul,* 6 Pet. 141, to the effect that "the laws of the State" were only those in force March 3, 1825; second assimilative statute of April 5, 1866, c. 24, 14 Stat. 13; § 5391, Rev. Stat.; act of 1898, 30 Stat. 717, and of March 4, 1909, c. 321, 35 Stat. 1145; see also *Franklin* v. *United States,* 216 U. S. 559.

A post office is "a place" within the meaning of the act of 1898. *United States* v. *Andem,* 158 Fed. Rep. 996; *United States* v. *Tucker,* 122 Fed. Rep. 518; *Sharon* v. *Hill,* 24 Fed. Rep. 726, 731.

As to what constituted criminal libel under the New York statutes in 1898, see New York Penal Code of 1881, §§ 242–251. Except as thereby modified the general rule of the common law as to the place where one may be prosecuted for libel prevails in New York.

The crime of libel does not consist in the mere composition of the article, or the physical production of the paper, but in exposing or publishing the defamatory matter to

the community. 2 Roscoe, Crim. Ev. 890, 897; Wharton, Crim. Law, 8th ed., 1618; 2 Bishop, Crim. Law, 6th ed., 905, 949; Townsend, Slander and Libel, 3d ed., 144.

One who writes a libel in one county with intent to publish and who afterwards publishes it in another may be indicted in both. 18 Am. & Eng. Ency. of Law, 1119, and cases cited; *Commonwealth* v. *Blanding*, 3 Pick. 304, approved in the *Palliser Case*, 136 U. S. 257, 266; and see *In re Cook*, 49 Fed. Rep. 833; *Armour Packing Co.* v. *United States*, 153 Fed. Rep. 1, 5; *Commonwealth* v. *Macloon*, 101 Massachusetts, 1; *Commonwealth* v. *Pettes*, 114 Massachusetts, 307, 311; *In re Dana*, 7 Ben. 1; *In re Buell*, 3 Dill. 116; *Haskell* v. *Bailey*, 25 U. S. App. 99; *State* v. *Kountz*, 12 Mo. App. 511; *Burton* v. *United States*, 202 U. S. 344, 388.

The act of July 7, 1898, applies to a libel circulated in West Point or the Post Office Building, although printed outside. The same act or series of acts may constitute an offense equally against the United States and the State, subjecting the guilty party to punishment under the laws of each government. *Cross* v. *North Carolina*, 132 U. S. 131, 139.

West Point and the Post Office Building are places over which the United States has exclusive jurisdiction within the terms of § 2 of the act of 1898. The Constitution gives Congress plenary legislative power over such places. Offenses committed therein are against the National sovereignty.

The court below cited no direct authority and there is none to support its position. At different times Congress has passed assimilative acts without attempting to except libel from their general terms. The last was approved on March 4, 1909. On the other hand, it has distinctly recognized that all crimes were intended to be included therein.

The defense that because the offense charged may be
-ished in New York and therefore was not intended to

be included in the act of 1898 is without merit; the State of New York cannot punish an offense committed at West Point against the United States. Such offense must be punished as here attempted, or be "dispunishable." *United States* v. *Davis,* 5 Mason, 356.

*Mr. Delancey Nicoll,* with whom *Mr. John D. Lindsay* and *Mr. Raymond D. Thurber* were on the brief, for defendant in error:

The Circuit Court properly entertained and passed upon the motion to quash on the trial. 1 Bishop's New Cr. Proc., § 759; *Reg.* v. *Heane,* 9 Cox, Cr. C. 433; *Justice* v. *State,* 17 Indiana, 56; *Bell* v. *Commonwealth,* 8 Gratt. 600.

This is not a moot case, since, should the judgment of the court below be reversed, the defendant may be placed on trial again.

Even though the language of the act of July 7, 1898 were literally broad enough to cover the case at bar, it should not be so construed. If there be any fair doubt whether the statute embraces it, that doubt is to be resolved in favor of the accused. *United States* v. *Clayton,* 2 Dill. 219; *United States* v. *Reese,* 5 Dill. 405, 414; *United States* v. *Whittier,* 5 Dill. 35; *United States* v. *Sheldon,* 2 Wheat. 119; *United States* v. *Wiltberger,* 5 Wheat. 76; *United States* v. *Garretson,* 42 Fed. Rep. 22, 25.

The general acquiescence of legal minds for nearly a century in the negative of the proposition, now asserted for the first time by the Government, forbids the interpretation of the statute in accordance with that proposition. *United States* v. *Hudson,* 7 Cranch, 32.

A literal construction of the statute would lead to injustice, oppression and absurd consequences. *United States* v. *Kirby,* 7 Wall. 482, 486.

According to the theory of the Government, the publication of a single newspaper article might constitute as many

distinct crimes as there are places under the jurisdiction of the United States, in the whole country. It would thus be possible to crush an owner or editor, under an intolerable burden of crime. Such a construction will not be put upon the act if it can be avoided, for it contravenes the fundamental principle of criminal jurisprudence that crime is not divisible. Wharton, Crim. Law., 10th ed., § 27; *State* v. *Commissioners*, 2 Murphy (N. C.), 371; *State* v. *Cooper*, 13 N. J. L. 361, 375.

The constitutional objection is also grave, for such a law does, in substance, abridge the liberty of speech and of the press,—that is, if to abridge such liberty means to so curtail it that no owner or editor of a paper could with safety freely discuss public affairs.

The construction contended for by the Government is not only unnecessary to remedy the definite evil aimed at by Congress, but would create an evil which it was the intention of Congress to avoid. *United States* v. *Palmer*, 3 Wheat. 610, 630, 632; *Holy Trinity Church* v. *United States*, 143 U. S. 457.

As to history of the assimilative acts see 1 Life of Joseph Story, Boston, 1851, pp. 244, 293, 297; The American Nation, Hart, 1819–1829; "Reaction toward State Sovereignty", 299; Annals of Congress, 17th Cong., 2nd Sess. 1822–1823, 929; 1 Debates in Congress, Gales & Seaton, 1824–1825, 157, including debate of Mr. Wickliffe, of Kentucky, Daniel Wesbter and Mr. Barbour.

The whole history and life of the country condemn the construction asserted by the Government. This is shown by the history of the sedition law of July 14, 1798, 1 Stat. 596. See McMaster's Hist. of People of U. S. 397; Von Holst, Const. Hist. of U. S. 142; 3 Wilson, Hist. of Am. People, 167; 2 Curtis, Const. Hist. of U. S. 3; 7 Jefferson's Writings, Putnam ed., 267, 295, 309.

The offense charged in the indictment is not even within the letter of the statute.

Mr. Chief Justice White, after making the foregoing statement, delivered the opinion of the court.

As we have stated, the indictment was based on the act of July 7, 1898, 30 Stat. 717, § 2. The effect of the act, as pointed out in *Franklin* v. *United States*, 216 U. S. 559, 568–569, was to incorporate the criminal laws of the several States in force on July 1, 1898, into the statute and to make such criminal laws to the extent of such incorporation laws of the United States. The text of the second section of the act of 1898 is this:

"That when any offense is committed in any place, jurisdiction over which has been retained by the United States, or ceded to it by a State, or which has been purchased with the consent of a State for the erection of a fort, magazine, arsenal, dockyard, or other needful building or structure, the punishment for which offense is not provided for by any law of the United States, the person committing such offense shall upon conviction in a Circuit or District Court of the United States for the district in which the offense was committed, be liable to and receive the same punishment as the laws of the State in which such place is situated now provide for the like offense when committed within the jurisdiction of such State, and the said courts are hereby vested with jurisdiction for such purpose; and no subsequent repeal of any such state law shall affect any such prosecution. (30 Stat. 717.)"

As it is conceded that there is no statute of the United States expressly defining and punishing the crime of criminal libel when committed on a United States reservation, etc., it follows that in order to determine the correctness of the ruling of the court below we are called upon, *a*, to accurately fix the extent to which, by the effect of the act of 1898, the criminal laws of the States were incorporated therein so as to authorize the punishment of crimes

defined by such laws as offenses against the United States, and, *b*, this being done to make an analysis of the criminal laws of the State of New York to ascertain whether the particular offenses here charged were made punishable by those laws, and if so, whether by virtue of the act of 1898 they constituted offenses against the laws of the United States punishable in the courts of the United States.

It is certain, on the face of the quoted section, that it exclusively relates to offenses committed on United States reservations, etc., which are "not provided for by any law of the United States," and that as to such offenses the state law, when they are by that law defined and punished, is adopted and made applicable. That is to say, while the statute leaves no doubt where acts are done on reservations which are expressly prohibited and punished as crimes by a law of the United States, that law is dominant and controlling, yet, on the other hand, where no law of the United States has expressly provided for the punishment of offenses committed on reservations, all acts done on such reservations which are made criminal by the laws of the several States are left to be punished under the applicable state statutes. When these results of the statute are borne in mind it becomes manifest that Congress, in adopting it, sedulously considered the twofold character of our constitutional government, and had in view the enlightened purpose, so far as the punishment of crime was concerned, to interfere as little as might be with the authority of the States on that subject over all territory situated within their exterior boundaries, and which hence would be subject to exclusive state jurisdiction but for the existence of a United States reservation. In accomplishing these purposes it is apparent that the statute, instead of fixing by its own terms the punishment for crimes committed on such reservations which were not previously provided for by a law of the United

States, adopted and wrote in the state law, with the single difference that the offense, although punished as an offense against the United States, was nevertheless punishable only in the way and to the extent that it would have been punishable if the territory embraced by the reservation remained subject to the jurisdiction of the State. While this meaning, we think, stands out in bold relief from the text of the section, the correctness of such meaning will be nevertheless readily demonstrated, even if, for the sake of argument, it be conceded that the text is ambiguous. We say this because a consideration of the genesis and development of the legislation which the act of 1898 embodies will leave no doubt that the construction we have given to the act enforces the exclusive and only purpose intended to be accomplished by its adoption.

It is undoubted, as pointed out in *Franklin* v. *United States, supra,* that the forerunner of the act of 1898 was the act of March 3, 1825 (ch. 65, 4 Stat. 115), since the act of 1898 is virtually a repetition of the act of 1825, except as to provisions plainly inserted merely for the purpose of bringing under the sway of the act United States reservations which on account of the restrictive terms of the act of 1825 were not embraced within the sphere of its operations. The act of 1825 was entitled "An act more effectually to provide for the punishment of certain crimes against the United States and for other purposes." Sections 1 and 2 of the act provided for the punishment of arson when committed within any fort, dockyard and other enumerated places, "the site whereof is ceded to, and under the jurisdiction of, the United States." The third section was as follows:

"SEC. 3. *And be it further enacted,* That if any offense shall be committed in any of the places aforesaid, the punishment of which offense is not especially provided for by any law of the United States, such offense shall, upon a conviction in any court of the United States having

cognizance thereof, be liable to, and receive the same punishment as the laws of the State in which such fort, dockyard, navy-yard, arsenal, armory, or magazine, or other place, ceded as aforesaid, is situated, provide for the like offense when committed within the body of any county of such State."

This section came under consideration in *United States* v. *Paul*, 6 Pet. 141, and it was held that its provisions referred only to the laws of the States existing at the time of the passage of the act, that is, those which were in force on March 3, 1825. It came also to pass that in considering the words "whereof is ceded" in the first section it was held that those words limited the operation of the act to places which had been ceded to the United States prior to the enactment of the act of 1825. *State* v. *Barney*, 5 Blatch. 294.

By the second section of the act of April 5, 1866 (ch. 24, 14 Stat. 13), Congress substantially reënacted the third section of the act of 1825, changing, however, its phraseology so as to cause its provisions to apply not only, as did the act of 1825, to a place ceded to the United States, but to "any place which has been or shall hereafter be ceded." As thus adopted the act passed into the Revised Statutes as § 5391 and continued in force until the passage of the act of 1898, which, it will be at once observed, makes no substantial change concerning the fundamental scope and purpose of the prior statute, since it simply enlarged the extent of its operation by causing the statute not only to embrace reservations which had been ceded to the United States, but those which had been carved out of the public domain.

If then the purpose and intent which led to the enactment of the act of 1825 can be discovered and made plain it must clearly result, as that act was but the precursor of the act of 1898, that the light generated by the original intent and purpose will afford an efficacious means for dis-

cerning the intent and purpose of the act of 1898. The
basis of the third section of the act of 1825 was the elev-
enth section of a bill drawn by Mr. Justice Story, and of
such eleventh section its author said (Life of Justice Story,
Boston, 1851, vol. 1, p. 293):

"This is the most important section of the whole bill.
The criminal code of the United States is singularly de-
fective and inefficient. . . . Few, very few, of the
practical crimes (if I may so say) are now punishable by
statutes, and if the courts have no general common law
jurisdiction (which is a vexed question), they are wholly
dispunishable. The state courts have no jurisdiction of
crimes committed on the high seas, or in places ceded to
the United States. Rapes, arsons, batteries, and a host
of other crimes may in these places be now committed
with impunity. Suppose a conspiracy to commit treason
in any of these places, by civil persons, how can the crime
be punished? These are cases where the United States
have an exclusive local jurisdiction. And can it be less
fit that the Government should have power to protect
itself in all other places where it exercises a legitimate
authority? That Congress has power to provide for all
crimes against the United States is incontestible."

It is certain that the fundamental purpose thus con-
templated by Mr. Justice Story was not overlooked or
intended to be departed from by the writer of the act of
1825. There can be no doubt on this subject, in view of
the fact that Mr. Webster, the author of that act, in re-
ferring to the third section of the bill by him drafted and
reported to Congress, (which section, as we have said, was
based upon the eleventh section of the bill drawn by
Mr. Justice Story), said:

" 'As to the third section, it must be obvious that,
where the jurisdiction of a small place, containing only
a few hundreds of people (a navy yard, for instance), was
ceded to the United States, some provision was required

for the punishment of offenses; and as, from the use to which the place was to be put, some crimes were likely to be more frequently committed than others, the committee had thought it sufficient to provide for these, and then to leave the residue to be punished by the laws of the State in which the yard, &c., might be. He was persuaded that the people would not view it as any hardship that the great class of minor offenses should continue to be punished in the same manner as they had been before the cession.' (*Id.* 338.) "

The demonstration of the purpose and scope of the act of 1825 is, if possible, made clearer by an amendment to which the act was subjected before it reached its final legislative form. As originally reported the fourth section provided for the punishment of certain designated crimes by the law of the United States when committed "upon the sea, or in any arm of the sea or in any river, haven, creek, basin, or bay, within the admiralty and maritime jurisdiction of the United States." But this provision was qualified in the passage of the bill, by the adoption of an amendment which added the words, "and out of the jurisdiction of any particular State." This amendment as finally adopted was the result in a somewhat modified form of a prior amendment offered by Mr. Wickliffe of Kentucky. Its meaning is not left to doubt, since Mr. Wickliffe in urging the adoption of the amendment expressly stated that it was "intended to prevent collisions between the authority of the General and State Governments. . . . He conceived the State Governments to be entirely competent to inquire into and punish crimes committed within their own jurisdictions, and that, as there was no necessity, there would be no advantage, in giving the United States concurrent power to do the same." Register of Debates in Congress, Gales & Seaton, 1824–1825, vol. 1, p. 154; *Id.*, pp. 157, 165–166, 166–167, 168, 335, 335*h*, 338.

Having fixed the meaning of the act of 1898, and, as heretofore stated, there being no law of the United States specifically punishing the offense of criminal libel when committed on a reservation, etc., of the United States, it remains only to determine whether, applying the law of the State of New York, in accordance with the act of 1898, there was power in the grand jury to present the indictment here under consideration or authority in the courts of the United States to entertain jurisdiction thereof as charging a substantive and distinct offense under the laws of the United States. That is to say, was the indictment found below consistent with the application of the state law in accordance with the provisions of the act of 1898?

The provisions of the penal code of New York on the subject of criminal libel at the date mentioned were as follows (Laws of New York, 1881, vol. 3, chap. 8):

"SEC. 243. A person who publishes a libel is guilty of a misdemeanor.

"SEC. 245. To sustain a charge of publishing a libel, it is not necessary that the matter complained of should have been seen by another. It is enough that the defendant knowingly displayed it, or parted with its immediate custody, under circumstances which exposed it to be seen or understood by another person than himself."

Sections 249 and 250, in substance, provided that where a person libeled is a resident of the State the prosecution shall be either in the county of such residence or the county where the paper is published, and that where the person libeled is a non-resident the prosecution shall be in the county in which the paper, on its face, purports to be published, or, if it does not so indicate, in any county in which it was circulated.

"SEC. 251. A person cannot be indicted or tried for the publication of the same libel, against the same person, in more than one county."

Section 138 of the Code of Criminal Procedure (Laws of New York, 1881, vol. 2, p. 43) contains similar provisions as to the place for the prosecution of a libel, and the immunity from liability to prosecution in more than one county. It was further provided:

"Sec. 139. When an act charged as a crime is within the jurisdiction of another state, territory or county, as well as within the jurisdiction of this state, a conviction or acquittal thereof in the former, is a bar to a prosecution or indictment therefor in this state.

"Sec. 140. When a crime is within the jurisdiction of two or more counties of this state, a conviction or acquittal thereof in one county is a bar to a prosecution or indictment thereof in another."

In view of the unity between the act of composing and the primary publication of a newspaper containing a libelous article within the State of New York, and of subsequent publications or repetitions thereof by the publisher of the newspaper which are clearly the resultant of the provisions of the laws of New York above quoted and referred to, two propositions are, we think, plainly established: First, that adequate means were afforded for punishing the circulation of the libel on a United States reservation by the state law and in the state courts without the necessity of resorting to the courts of the United States for redress. Second, that resort could not be had to the courts of the United States to punish the act of publishing a newspaper libel by circulating a copy of the newspaper on the reservation upon the theory that such publication was an independent offense, separate and distinct from the primary printing and publishing of the libelous article within the State of New York, without disregarding the laws of that State and frustrating the plain purpose of such law, which was that there should be but a single prosecution and conviction.

These propositions being true, it follows in the light

of the construction which we have given the act of 1898 that the court below was right in quashing the indictment as not authorized by that act. No other conclusion we think was possible, as the court could not have sustained the indictment without giving to the statute a meaning directly conflicting with the construction which we have affixed to it. In other words, the court could not have upheld the indictment without deciding that because the statute provided that acts when committed on United States reservations, which were not expressly made criminal by a law of the United States, might be prosecuted and punished in accordance with the state law, therefore a prosecution was authorized which was inconsistent with that law and in disregard thereof. And, further, albeit that Congress having regard for the autonomy of the States had deemed it best not to treat reservations within States as foreign to the States for the purpose of punishing crime unless expressly provided to the contrary, nevertheless the legislation enacted by Congress for this purpose had destroyed the end contemplated, since that legislation when rightly construed, while applying the state legislation to crimes committed on a reservation as if the territory was not foreign but domestic, at the same time exacted that the state law when thus applied should be enforced as if the territory was in no respects for the purpose domestic, but on the contrary was wholly foreign. The contradiction and confusion to which the contention thus reduces itself is too apparent to require anything but statement. Indeed, we think the misconception just pointed out lies at the basis of all the propositions so ably pressed at bar to secure a reversal, since they all depend upon a construction of the act of 1898, which we hold to be wrong. Great therefore as might otherwise be their potency with the foundation gone upon which they rest, all come to this, that the statute sanctions that which it by necessary implication prohibits, and, moreover, destroys the great public

purpose which its adoption was intended to foster and protect.

The ruling which we now make does not of course extend to a subject which is not before us. It follows, therefore, that we do not now intimate that the rule which in this case has controlled our decision would be applicable to a case where an indictment was found in a court of the United States for a crime which was wholly committed on a reservation, disconnected with acts committed within the jurisdiction of the State, and where the prosecution for such crime in the courts of the United States instead of being in conflict with the applicable state law was in all respects in harmony therewith.

*Affirmed.*