Joseph L. SMAYDA and Wendell H. Gunther, Appellants,

v.

UNITED STATES of America, Appellee.

No. 19156.

United States Court of Appeals Ninth Circuit.

Oct. 11, 1965.

Certiorari Denied Jan. 17, 1966.

See 86 S.Ct. 555.

Browning, Circuit Judge, dissented.

Herbert Donaldson, San Francisco, Cal., for appellants.

Cecil F. Poole, U. S. Atty., Jerrold M. Ladar, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before POPE, BROWNING and DUN-IWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

Smayda and Gunther were convicted of violating the "Assimilative Crimes" Act, 18 U.S.C. § 13.[1] The offense was committed within Yosemite National Park, concededly a place of the type referred

---

1. "Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment."

to in the section and in 18 U.S.C. § 7. The crime, oral copulation, is made punishable by the California Penal Code, Section 288a. Both defendants appeal. Their attack upon the judgment is based entirely upon their claim that all of the evidence against them was obtained in violation of their rights as defined in the Fourth Amendment to the Constitution:

"The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated * * *."

The offense occurred in a men's toilet and washroom, at Camp Curry, a resort in the Park maintained and operated by the Yosemite Park & Curry Co., a government concessionaire. The particular facility is in a portion of the resort where tent-cabins, equipped for the accommodation of guests, are located. It is maintained primarily for the use of guests, but appears to be open, like most such facilities in hotels, to the public. In the men's section of the building, which is enclosed by walls having windows in them set with the sills about 5 or 6 feet from the floor, there are wash basins, a urinal and three toilets. The latter are separately enclosed in stalls set side by side. The back wall of all three is a floor to ceiling partition, behind which is a space for getting at the pipes and similar purposes. One stall, which we call No. 1, is set at the side of the room, so that one of its sides is also a solid wall, from floor to ceiling. The partitions between the stalls and the exterior side wall of the third stall in the row (No. 3) are each made of a single thickness of boards, beginning about 18 inches above the floor and extending to about 3 feet from the ceiling, or a height of about 6 feet. Each stall has a door that swings inward and rests against a jamb when closed. The bottom of the door is a few inches higher above the floor than the bottom of the partitions and the top a few inches lower than the top of the partitions. The doors do not automatically swing shut and there is no lock, latch, or bolt with which to fasten them from the inside. Thus, an occupant of the stall cannot prevent someone else from entering except by holding the door shut. There is a light bulb in the ceiling just outside the door of the center stall (No. 2), and other light bulbs are in the main room, but none is over the stalls themselves. Above the whole restroom, under a peaked roof, is an open space or attic.

In the summer of 1963, between Memorial Day and July 13, both the manager of the resort and the park rangers, who also serve as park police, received complaints and information and themselves observed persons and conduct, indicating to them that restroom 600 was being used by homosexuals as a "hangout" and a place in which homosexual activities were being carried on. Persons unknown had cut holes in the two partitions separating stall No. 2 from stalls Nos. 1 and 3, each hole being about 2 inches square and about waist high from the floor. There were stains indicating use of these holes for lewd purposes. There were also smaller holes through which one using a toilet could peer into the adjoining stall. We do not detail all of the evidence in this regard; it was ample to give the manager and the rangers reasonable cause to believe that the stalls in restroom 600 had been and would be used in violation of Penal Code section 288a.

As a result, the manager of the resort discussed the problem with Ranger Twight, the law enforcement specialist in the Park, and it was decided that a hole should be cut in the ceiling over each stall, for purposes of observation. This was done, each hole being about 6 inches square and covered with a screen so as to make it look like an air vent. It was believed that criminal acts were most likely to occur at night, and particularly Saturday night, so that Ranger Twight decided to conduct surveillance on Saturday evening "after the family-type people had quit using the facility." Surveillance was conducted first on the night of July 13 from 11:00 P.M. to mid-

night. Twight and a photographer were in the attic, and two rangers with a radio were outside where they could be called immediately. Some 25 or 30 persons were observed who simply made the normal use of the stall. Others were seen who peered through holes in the partitions, looked at each other over the partitions, masturbated, and at least two of whom performed an indecent act through the hole in the partition, but not in violation of P.C. § 288a. No arrests were made.

On July 20, similar surveillance was begun at 11:00 P.M. Six or seven persons whose behavior was normal were observed. Within five minutes after the surveillance began appellant Gunther appeared and entered one of the stalls. He remained for about 15 minutes, masturbated, and peered through the holes. He then left. A hand reached up and unscrewed the light bulb in front of the stalls. The officers could not see whose hand it was. Gunther returned shortly, and went through the same performance for about 15 minutes. He again left, returned and entered stall No. 2. Smayda then came in and entered stall No. 1. They peered at each other, masturbated, and then committed the crime through the hole in the partition. Photographs were taken. Twight, by radio, summoned the waiting rangers, and the appellants were arrested.

The record makes it clear that, while there was reason to believe that someone might commit the offense that evening, there was no reason to believe, at any time until after each appellant entered a stall, that that particular person was about to commit it.

Appellants rely primarily upon two California cases, Bielicki v. Superior Court, 1962, 57 Cal.2d 602, 21 Cal.Rptr. 552, 371 P.2d 288 and Britt v. Superior Court, 1962, 58 Cal.2d 469, 24 Cal.Rptr. 849, 374 P.2d 817. In each case, under quite similar circumstances,[2] it was held that the surveillance was an unreasonable search, forbidden by both Article I § 19 of the California Constitution and the Fourth Amendment to the United States Constitution, and that evidence thus obtained was inadmissible.

 It is suggested that we should follow these cases because, under the Assimilative Crimes Act, we are applying California law, and it would be anomalous if the defendants could be convicted under that Act of an offense for which they could not be convicted in a California court. We do not agree. The Assimilative Crimes Act creates a federal offense; it refers to the California statutes for its definition and its penalty,[3] but it does not incorporate the whole criminal and constitutional law of California.[4] In a federal court, the question of whether evidence was unlawfully obtained, and should therefore be excluded, is a federal question. We look, then, to the Constitution of the United States, not that of California. A decision of the Supreme Court of California, construing the Constitution of the United States, while entitled to great respect, is not binding upon the federal courts.

Our question then is, does the Fourth Amendment forbid what was done here? We hold that it does not, on two alternative grounds: (1) If the ranger's conduct was a "search," appellants impliedly consented to it by doing what they did where they did it, and (2) there was no

---

2. In Bielicki, the stall was a pay toilet, with a lock; in Britt the door could be locked. The opinions indicate that the enclosure, in each case, was more complete than here. We do not, however, distinguish the cases on that ground.

3. Sharon v. Hill, C.C.D.Cal., 1885, 24 F. 726, 731; People of Puerto Rico v. Shell Co., 1937, 302 U.S. 253, 265–66, 58 S.Ct. 167, 82 L.Ed. 235; United States v. Press

Publishing Co., 1911, 219 U.S. 1, 31 S.Ct. 212, 55 L.Ed. 65.

4. United States v. Andem, D.C., N.J.1908, 158 F. 996, 1000; McCoy v. Pescor, 8 Cir., 1944, 145 F.2d 260; cf. Johnson v. Yellow Cab Transit Co., 1944, 321 U.S. 383, 388–392, 64 S.Ct. 622, 88 L.Ed. 814; Williams v. United States, 1946, 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962.

"unreasonable search" within the meaning of the amendment.

1. The District Judge, after hearing the testimony and examining photographs of the stalls, received in evidence as exhibits, reached the following conclusion:

" * * * I looked at the pictures and I think that there is something that we have got to consider here in the physical set-up of this bathroom and the physical characteristics of these doors. Mr. Porterfield in his argument referred to the train lobby observation point where the con man was witnessed making evidently some fast change and the Court held that he was out in the public when he was under surveillance, and, nevertheless, this was not an invasion of his privacy, and I attempted to distinguish that situation from that of where the person is in the extreme privacy of a lavatory, and that on the one hand he expects the whole world to see what he is doing, whereas, in the privacy of a toilet, he could not expect the whole world to see what he was doing. But viewing these pictures, a great deal of the privacy is taken out of these toilet stalls by the fact that they're wide open for three feet at the top and they're wide open for approximately 18 inches at the bottom. They are almost public. When a person goes into a stall of this type, the only reason for that door, in my opinion, is to shield the person who uses the lavatory from the very intimate details. When Mr. Twight could testify from out in the lobby that he could tell whether the man had his pants up or down in the customary fashion, a great deal of the privacy certainly is gone from the transaction that the person went in there to consummate." per curiam

We agree. Confining our ruling to the facts of this case, we think that, when people resort to such a public toilet for criminal purposes, they deliberately take the chance that they may be observed by police officers, and that they are not protected from such observation, whether clandestine or otherwise, because they choose to use the most nearly "private" part of such a facility—the toilet stall, which is customarily partially partitioned off, but for the provision of at least a minimum of public decency. The language of the California District Court of Appeal in People v. Young, 1963, 214 Cal.App.2d 131, 29 Cal.Rptr. 492, is, we think, persuasive here:

"Judges can take judicial knowledge from the case files in their own courts that public toilets in metropolitan parks, terminals, theatres, department stores and in similar places, frequented daily by masses of people, are often the locale of vice of many kinds such as sexual perversion, sale of narcotics, petty thefts, robbery and assaults. To hold that the public areas of such toilets are to be 'off limits' from clandestine surveillance by police would be to encourage the use of such places by perverts, panderers, pickpockets, addicts and hoodlums. Such persons would seek asylum or refuge in such places with the assurance that they could conduct their illicit activities therein while fully protected from the secret surveillance of the vice squad. Should the areas of such toilets, where the members of the public are free to circulate, as distinguished from areas where one may seclude oneself from public view, such as in an enclosed commode or toilet stall, become areas removed from such secret surveillance by the police, the peril to immature and innocent youth would be increased immeasurably. By leaving a 'spotter' or 'lookout' at the door to warn other perverts or degenerates of the approach of police, such immoral persons could conduct their illicit activities in full view of impressionable youths. Parents would not rest secure that their youngsters could use such facilities without fear that they would wit-

ness scenes of shocking adult degeneracy such as witnessed by the police in the instant case."

In accord is People v. Norton, 1962, 209 Cal.App.2d 173, 25 Cal.Rptr. 676.

In both Young and Norton, the Bielicki and Britt cases, supra are distinguished on the ground that in those cases the toilets were enclosed, whereas in Young and Norton there were no doors on the stalls, so that any member of the public who came in could have seen the offense. We do not decide whether such a distinction is valid. As the District Judge found in this case, it would have been easy for any member of the public to see the offense. Any member of the public could have peered over the door, or the side partitions, or under either, or pushed open the door. We think that, as the Court said in Norton, "If appellant[s] had any right of privacy [they] certainly waived it" (25 Cal.Rptr. at 678).

No case has yet stretched the Fourth Amendment to make its restrictions applicable to a clandestine observation, by officers of the law, of what goes on in a public place. We decline to be the first court to do so, and we think that these stalls were, in essence, a public place. It makes no difference that in this case, as in Norton and Young, the officer was concealed. By using a public place appellants risked observation, and they have no constitutional right to demand that such observation be made only by one whom they could see.

2. While we agree that both the eye and the ear as well as the hand, can "search", we find here no unreasonable search within the meaning of the Fourth Amendment, as the courts have defined it to date.

On this phase of the matter, the District Judge concluded:

"I do not feel that it was an unreasonable search. Again, I apply it to the facts of this particular case: the doors, the openness, the fact that there had been two complaints in the prior week and one within half an hour just preceding

the actual commencement of the search, the fact that almost immediately after Twight took his position in the attic he observed Gunther come in and go out and come in and go out and come back in again, I think that all of this gave the search the necessary degree of reasonability that it could be continued up to the point when finally evidently Mr. Smayda came in and the criminal act was consummated."

In essence, the court found that the "search" was reasonable. We might not state the matter just as he did, but we, too, think that it was reasonable under the circumstances.

We revert to the specific language of the amendment—"The right of the people to be secure in their *persons, houses, papers and effects.*" Here was no physical search of appellants' persons; only observation from a distance, albeit a short one. Here no papers or effects of any kind were discovered or seized. Here, if anything, there was only an invasion, by the eye, of appellants' "house", if a public toilet stall can be so called while they occupied it. Appellants point to cases extending the protected area from the ordinary conception of a "house" to such places as the private portion of a business office (Silverthorne Lumber Co. v. United States, 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319), a locked store, apparently attached to a house (Amos v. United States, 1921, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654), a private automobile and office (Davis v. United States, 1946, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (dictum)), a hotel room (Lustig v. United States, 1949, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819; United States v. Jeffers, 1951, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59), an apartment (Jones v. United States, 1960, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed. 2d 697), an automobile (Gambino v. United States, 1927, 275 U.S. 310, 4 S.Ct. 137, 72 L.Ed. 293) (treated as an extension of the person), and a taxi (Rios v. United States, 1960, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688). Rios and

Gambino are perhaps most closely analogous—but in those cases there was either a physical search of the car (Gambino) or a seizure of evidence in it (Rios). Surely, if all that were involved were a seeing of what the party did in the car, that would not have been an illegal search, absent some other illegal conduct by the officers.

The essence of appellants' position is that, while they were in the stalls, those stalls became private places—analogous to their houses—and hence protected from police observation. But even the inspection of the interior of a house, from the outside, and without a trespass by the officers, has never been held to be an unlawful search. The theory is that people who choose to commit crimes where they may be seen take the chance that they will be seen.

If we assume that, when appellants entered the stalls, they then acquired some sort of right, however temporary, to their exclusive occupancy, we think that they acquired that right subject to the condition in which the stalls then were—including not only the spaces above and below the partitions and the doors and the holes in the walls, which they were quite willing to use, but also the holes in the ceiling. No rights of theirs were invaded when the holes were made; they were made by persons who had a right to make them, and at a time when the appellants had no "rights" at all in the stalls. No rights of appellants were invaded when the ranger and photographer went into the attic. No rights of anyone were infringed by their mere presence. All that appellants complain of is that they were seen.

So far, at least, the Supreme Court has not extended the Fourth Amendment to such a situation. In every case, there has been some physical and unconsented to invasion of a private place, the property (either permanent or temporary) of the defendant or of a non-consenting third person. In the case of hotel rooms and apartments, these are so analogous to a home that the Courts treated them in the same way where the amendment

has been held to be violated. In each such case, there has been an actual physical invasion—a trespass. Where this has not occurred, the discovery of crime, even by the electronically extended ear, has been upheld. (Goldman v. United States, 1942, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322—detectaphone in adjoining room, On Lee v. United States, 1952, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270—lawful entry—agent wired for sound, Lopez v. United States, 1963, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462, cf. Lanza v. State of New York, 1962, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384). We apply the same rule here, to the officer's eye.

It is asserted that we have here a "general exploratory search," and that it is therefore unreasonable. The cases relied upon (United States v. Lefkowitz, 1932, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877; Go-Bart Importing Co. v. United States, 1931, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374) are different—each involved the physical invasion of private premises, an arrest, and then a general exploratory search of the premises for evidence of crime. Compare Harris v. United States, 1947, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653.

To sustain appellants' contention, we would have to hold that appellants have a right of privacy, protected by the Fourth Amendment, that is so broad that it extends to what they do in a public toilet. That there is a right of privacy, we agree. (McDonald v. United States, 1948, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153; Brock v. United States, 5 Cir., 1955, 223 F.2d 681; People of State of Cal. v. Hurst, 9 Cir., 1964, 325 F.2d 891, 898, reversed on other grounds, 381 U.S. 760, 85 S.Ct. 1796, 14 L.Ed.2d 713, cf. Griswold v. Connecticut, 1965, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510; Beaney, "The Constitutional Right to Privacy in the Supreme Court," The Supreme Court Review, 1962, 212). The question, however, is the extent of that right. (See, generally, Note, 63

Columb.L.R. 955, 1963). We agree that every person who enters an enclosed stall in a public toilet is entitled to believe that, while there, he will have at least the modicum of privacy that its design affords. We would not uphold a clandestine surveillance of such an area without cause. We are made as uncomfortable as the next man by the thought that our own legitimate activities in such a place may be spied upon by the police. We also think, however, that the nature of the place, the nature of the criminal activities that can and do occur in it, the ready availability therein of a receptacle for disposing of incriminating evidence, and the right of the public to expect that the police will put a stop to its use as a resort for crime all join to require a reasonable limitation upon the right of privacy involved. We hold that when, as here, the police have reasonable cause to believe that public toilet stalls are being used in the commission of crime, and when, as here, they confine their activities to the times when such crimes are most likely to occur, they are entitled to institute clandestine surveillance, even though they do not have probable cause to believe that the particular persons whom they may thus catch in *flagrante delicto* have committed or will commit the crime. The public interest in its privacy, we think, must, to that extent, be subordinated to the public interest in law enforcement.

Affirmed.

POPE, Circuit Judge (concurring).

In my view Judge Duniway's opinion that there was probable cause for the viewing that the officers made, and that there was here no unreasonable search within the meaning of the Fourth Amendment, is a correct one. I am not prepared to agree that appellants waived any right they may have had, but it is unnecessary that I do so.

I wish to note several things about this case which I believe to be unique and without precedent. In the first place, there was no "actual intrusion into a constitutionally protected area." [1] The ceiling where the windows were cut was, as the exhibits show, at least three feet above the highest portion of the toilet stall, and above an open area unconnected with the stalls. Assuming that the occupied portions of the stalls were properly treated as a part of the "persons, houses, papers, and effects" to be protected against unreasonable searches, those who viewed what was happening in the stalls made no "actual intrusion" herein.

Again, the record shows that the viewing windows were installed by a private concern, the Yosemite Park and Curry Company. Mr. Whiteman, the manager of the Company, stated "I suggested it." and that he had company carpenters cut the holes.

Plainly enough, up to that point there had been no violation of Fourth Amendment rights. Such an act, or even a completed search by a private individual, is not within the Amendment's prohibitions. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048.[2]

The Camp Curry management had initially provided these toilet facilities to care for the needs of the ordinary camper. Then it discovered that these facilities were being used for lewd and unlawful purposes. The cutting of the holes in the partitions pointed to their use for "homosexual acts." The manager knew of one complaint to his social hostess based on an eye witness account of such an incident which occurred there. The report was of "an oral thing that he had observed through another hole in the stall." Writings on the walls of

---

1. The quoted language is from Silverman v. United States, 365 U.S. 505 at 512, 81 S.Ct. 679 at 683, 5 L.Ed.2d 734.

2. "Private detectives may use methods to obtain evidence not open to officers of

the law." Irvine v. People of State of California, 347 U.S. 128, 136, 74 S.Ct. 381, 385, 98 L.Ed. 561, and cases there cited.

other restrooms had pointed to this particular building as a place for homosexual activity. Unexplained loitering about the place by male persons, whose appearance suggested homosexuals, especially late at night, the turning out of the light over the stalls, the attack, apparently by a homosexual person, upon a camp employee in his tent in this vicinity, indicated the same thing. These, and other circumstances related in Judge Duniway's opinion, which he holds, rightly I think, constituted reasonably trustworthy information sufficient to constitute probable cause for believing a crime was about to be committed, all gave the camp manager a justified determination not longer to continue to maintain, at company expense, a hangout for lechery and debauchery in the form of homosexuality, sodomy and pederasty. Anything which the manager, as manager, did to stop this sort of thing would not call for judgment under the Fourth Amendment.

Let me suggest a less bizarre instance of such a thing. A rooming house keeper suspects that the occupants of a downstairs front bedroom are engaging in criminal activities. He surreptitiously alters the angle of the venetian blinds on the front windows so as to permit a view of the room from the front sidewalk. Then he asks the police to stand on the walk and look in.

In that case there could not possibly be any objection to the officer's testimony as to the unlawful acts he observed. An officer, standing in a place where he has a right to be, may look and observe what is in plain sight. He may use field glasses or a searchlight. United States v. Lee, 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed. 1202. He may make observations of evidence of crime through an open door. Ker v. State of California, 374 U.S. 23, 36–37, 83 S.Ct. 1623, 10 L.Ed.2d 726; Fisher v. United States,

92 U.S.App.D.C. 247, 205 F.2d 702; United States v. Barone, 2 cir., 330 F.2d 543, 544; or by looking through a car window with a flashlight, Petteway v. United States, 4 cir., 261 F.2d 53, or into an open car trunk, United States v. Williams, 6 cir., 314 F.2d 795, 799, or into the window of a house, People v. Martin, 45 Cal.2d 755, 762, 290 P.2d 855, 858, and cases there cited. In the hypothetical case I have mentioned, the officer on the sidewalk could properly view the interior of the bedroom—it was wide open to his view. And the fact that the occupants of the room did not notice or know that the venetian blinds had been changed to permit a view would be immaterial.

So here, the defendants' lack of knowledge that the holes above the stalls were view windows is immaterial. I know of no rule of law that a person committing a crime must be alerted or warned that he is being watched. This is plain from Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, and On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967. The term "right of privacy" which appears in the dissenting opinion, when used in connection with facts involving unlawful entry and seizure, is a useful slogan; but I know of no "right of privacy" per se.[3] Many crimes, perhaps the most of them, are committed in stealth and in the dark. To say that the police, though standing in a place where they have a right to be, cannot peek or spy upon such activities because of a supposed "right of privacy" appears to me to be absurd.

Thus the cutting of the holes in the ceiling by the company carpenters is something of which these defendants cannot complain, for it was the act of a private company and of its manager. That the manager consulted with the Park Ranger in planning his operations is immaterial. The changes were those of the manager.

3. Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, spoke of a marital right of privacy, noting that various constitutional guarantees create "zones of privacy". But the decision is based on the Court's abhorrence of allowing "the police to search the sacred precincts of marital bedrooms." Nothing in the present case resembles a "right of privacy in marriage."

And the looking through the windows was no different than looking through any other window,—in a house or in an automobile, where no trespass was involved. So wholly apart from the question of reasonable and probable cause, there was no act in violation of the Fourteenth Amendment here.

The existence of probable cause is not affected by the fact that much of the information acted upon was hearsay. Ker v. State of California, supra, 374 U.S. at p. 36, 83 S.Ct. 1623. Nor is it material that there was no evidence to point at these particular defendants as the ones who cut the holes or turned out the lights. In many, perhaps most, lawful police inquiries and searches for crime, where there is probable cause to anticipate an offense, the identity of the anticipated wrongdoer is unknown.

Reference to the common requirement of a warrant is misplaced here. The special facts of this case make it plain that a search warrant would serve no useful purpose. The management had plenty of opportunity to examine the stalls. A search warrant for that purpose was not required.

A warrant was not only not needed, but would accomplish nothing in apprehending the unknown deviates who were plainly operating in this area. Does this mean that such persons may not be apprehended or prosecuted because a warrant is out of the question? Obviously not. What it does mean, I submit, is that a somewhat less strict view of what is adequate proof of probable cause for search must be taken. By any known test, however, I think there was reasonable and probable cause for action by the Rangers.

Finally, I think the court which decided Bielicki v. Superior Court, 57 Cal. 2d 602, 21 Cal.Rptr. 552, 371 P.2d 288, would reach a different result in a case like this. In such case the California court would hold applicable its rule in People v. Gorg, 45 Cal.2d 776, 783, 291 P.2d 469, described in Bielicki as a rule "to the effect that a search is not unreasonable if made with the permission of one who, by virtue of his relationship to the defendant or other circumstances, the officers reasonably and in good faith believed had authority to consent to their entry."

BROWNING, Circuit Judge (dissenting).

The court's decision is in conflict with decisions of the Supreme Court of the State of California concerning the protection which the Constitution of the United States affords against unreasonable searches and seizures in the circumstances here involved.[1] The reasons given by the court for taking a narrower view of the Constitution's coverage do not seem persuasive.

Since the central purpose of the Fourth Amendment is to protect the privacy of persons and property (Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)), it is easy to agree that the Amendment does not apply where there is no privacy to protect. It is also easy to agree that it is not a "search" to watch persons who are in plain sight in a public place, and that this is no less true when observation is clandestine than when it is open.

But less than complete privacy is not the equivalent of no privacy at all. The Fourth Amendment protects limited privacy—which, after all, is the only kind

1. Bielicki v. Superior Court, 57 Cal.2d 602, 21 Cal.Rptr. 552, 371 P.2d 288 (1962); Britt v. Superior Court, 58 Cal.2d 469, 24 Cal.Rptr. 849, 374 P.2d 817 (1962). The opinion of the court concedes as much. The concurring opinion suggests that the California court might arrive at the same result as this court does by applying the rule of People v. Gorg, 45 Cal.2d 776, 291 P.2d 469 (1955). This seems unlikely in view of the United States Supreme Court's recent statement that "Our decisions make it clear that rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'" Stoner v. State of California, 376 U.S. 483, 488, 84 S.Ct. 889, 892, 11 L.Ed.2d 856 (1964).

people ordinarily know. Houses, hotel rooms, offices, private automobiles, and taxicabs all have windows exposing portions of their interiors, and hotel rooms, offices, and taxicabs must be shared to varying degrees with cleaning people, customers, clients, and taxi drivers. Yet the intrusion of police officers into these places may violate the Fourth Amendment, as demonstrated by cases cited in the court's opinion, and many others.

The Fourth Amendment does not protect conversations in prison waiting rooms, because in prisons "official surveillance has traditionally been the order of the day." Lanza v. State of New York, 370 U.S. 139, 143, 182 S.Ct. 1218, 1221 (1962). But it does protect conversations in homes, where privacy is ordinarily respected. Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679 (1961). As the court suggests, the Fourth Amendment does not prevent a policeman from looking into the window of an automobile on a public street. Petteway v. United States, 261 F.2d 53, 54 (4th Cir. 1958). But the officer may not open the door for a closer inspection without complying with the Amendment's terms. Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); Gambino v. United States, 275 U.S. 310, 4 S.Ct. 137, 72 L.Ed. 293 (1927). In sum, the Fourth Amendment protects such privacy as a reasonable person would suppose to exist in given circumstances.

Persons using the toilet stalls in the Camp Curry restroom did so with the reasonable expectation of partial privacy. The stalls were constructed, as the district court put it, "to shield the person who uses the lavatory from the very intimate details"; or, in this court's phrase, to provide "at least a minimum of public decency." As this court states, "every person who enters an enclosed stall in a public toilet is entitled to believe that, while there, he will have at least a modicum of privacy that its design affords."

It was precisely this "modicum of privacy" which the officers invaded. They did not confine their observation to what might have been seen over or under the doors or side partitions from the public area of the toilet. Their search extended to every corner of the stalls' interiors. They watched the "intimate details" of the activity of persons who used them. What they observed and photographed could not have been seen and photographed from the public area. As government counsel candidly stated, "Because of the physical set-up in the restrooms themselves they couldn't physically observe this activity. So they undertook to cut holes in the ceiling and watch from up there."

From the viewpoint of those who used the stalls, ceiling peepholes six inches square, centered over each stall,[2] and deliberately screened and finished to give the appearance of ventilating outlets cannot be analogized, as the concurring opinion suggests, to windows in a wall. And it is pure fiction to say that those who used the stalls "impliedly consented" to surveillance through these apertures and "waived" their right to the limited privacy which the enclosed stalls in fact appeared to afford.[3] The law does not

2. The statement in the concurring opinion that the holes were cut "above an open area unconnected with the stalls," can only refer to the fact that there was a three-foot space between the top of the stalls and the ceiling.

3. As the Supreme Court of California said in Bielicki v. Superior Court, 371 P.2d 288, 290–291 (1962) (citations omitted):
 "While a search is not unreasonable if made with the defendant's consent * * * here petitioners obviously gave

no actual consent to being spied upon through the pipe in the ceiling. Nor can it be said that because the restroom was open to use by the general public (1) petitioners 'impliedly' gave their consent to such observation, or (2) consent was unnecessary because there was no search * * *. In each of the just cited cases the police officers entered upon premises *open to the general public* and while there saw, as any member of the public could also have seen, illegal objects or activities

permit constructive consent or fictional waiver to override constitutional rights.[4]

It may be assumed, for purposes of this case, that the Supreme Court will limit Fourth Amendment protection against eavesdropping to cases involving the "reality of an actual intrusion into a constitutionally protected area." Silverman v. United States, 365 U.S. 505, 512, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961).[5] Cutting an observation hole in the ceiling over each toilet stall constituted an "actual intrusion" into the area as much as did driving a spike microphone into the wall in Silverman— the one to permit search by ear, the other by eye. And the intrusion did not cease once the microphone was in place or the hole was cut. It continued so long as the officers listened on the earphones or looked through the aperture. The Supreme Court recognized as much in Goldman v. United States, 316 U.S. 129, 134, 62 S.Ct. 993, 86 L.Ed. 1322 (1942).

Electronic or visual snooping in an apartment, hotel room, or office is not beyond the reach of the Fourth Amendment simply because the means to accomplish the intrusion are installed before the victim rents the premises. Surely it is wrong to hold, as this court apparently does, that those who occupy such premises do so subject to the presence and subsequent use of previously installed means for secret surveillance.

Once the applicability of the Fourth Amendment is accepted, violation of its requirements in this case is clear. The officers made no effort to secure a warrant. "Over and over again this Court has emphasized that the mandate of the Amendment requires adherence to judicial processes. Only where incident to a valid arrest, or in 'exceptional circumstances,' may an exemption lie * * *." United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951) (citations omitted). The search was not incident to an arrest, and no contention is made that exigent circumstances justified the warrantless search. The court cites no case—there is none—holding that such a search may be sustained as "reasonable".[6]

The search offended the Fourth Amendment for another reason. As the Supreme Court of California said of similar police surveillance in Bielicki v. Superior Court, supra, 21 Cal.Rptr. 552, 371 P.2d at 290: "Such a practice

---

justifying further search or arrest. But in the case at bench Officer Hetzel climbed upon the roof of the restroom —which was certainly not a portion of the premises that was open to the general public—and from that vantage point secretly observed activities of petitioners which no member of the public could have seen, as they were carried on within the confines of toilet booths each enclosed by three walls and a door."

4. The quotation from People v. Young, 214 Cal.App.2d 131, 29 Cal.Rptr. 492 (Dist. Ct. App.1963), relied upon by the court is inapposite. Secret surveillance was permitted of "the areas of such toilets, where the members of the public are free to circulate, as distinguished from areas where one may seclude oneself from public view, such as in an enclosed commode or toilet stall."

5. Technical trespass is clearly not required. Silverman v. United States, 365 U.S. at 511, 512, 81 S.Ct. 679. See also McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Regalado v. California, 374 U.S. 497, 83 S.Ct. 1875, 10 L.Ed.2d 1044 (1963). And the latter two cases strongly suggest that visual observation of a private area through apertures not intended by the occupants to be used for that purpose (a transom in McDonald, a hole in a door in Regalado) constitutes a search within the Fourth Amendment though there is neither physical intrusion nor trespass.

6. If we were permitted to approve as "reasonable" a warrantless search not incident to an arrest or justified by exigent circumstances, the search conducted here would be a doubtful candidate, in view of the court's premise that the illegal activity was observable from the public area. Forty innocent users of the stalls were subjected to secret surveillance justified only by police convenience—a search "not really essential to the conviction but merely a routine substitute for more arduous but less intrusive modes of investigation." (16 Stan.L.Rev. 318, 350 (1964)).

amounts to a general exploratory search conducted solely to find evidence of guilt, a practice condemned * * * by federal law." Searches of this character are reminiscent of the abusive writs of assistance and general warrants which motivated the adoption of the Fourth Amendment. See Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). See also Britt v. Superior Court, 58 Cal.2d 469, 24 Cal. Rptr. 849, 374 P.2d 817, 818 (1962), and cases cited.

The ultimate object of the Fourth Amendment is protection of the innocent. The innocent are shielded from unjustified search by the requirement that no warrant issue unless a magistrate is first satisfied that grounds for the search exist. The innocent are afforded some protection from the abuse of warrantless searches incident to arrest by the requirement of probable cause for the arrest itself. The exigent circumstances exception is at least narrowly confined, and supported by practical necessity. But if general exploratory searches for evidence are permitted, the innocent will be as much exposed to intrusions upon their privacy as the guilty; as, indeed, forty innocent men were in the course of this general search.

Since the testimony and photographs introduced at trial were in fact the product of unconstitutional police surveillance through the ceiling holes, it would make no difference if it were true, as the court suggests, that the officers could have seen enough from the public area to know that the crime was being committed. As the Supreme Court of California said in Britt v. Superior Court, 24 Cal.Rptr. 849, 374 P.2d 817, 819 (1962):

"And while the act committed in the present case might possibly have been visible—at least to some extent —had the officer been observing from a public common use portion of the restroom, the fact remains that he was not so stationed and the subject evidence was not so ob-

tained; rather, it was discovered solely by means of the just described impermissible search, and hence was inadmissible * * *."

Evidence seized in violation of constitutional rights must be excluded, though precisely the same evidence might have been obtained lawfully by a valid search. Abel v. United States, 362 U.S. 217, 234, 80 S.Ct. 683, 4 L.Ed.2d 668 (1962).

Since the "modicum of privacy" which the stall afforded is protected by the Fourth Amendment, other arguments advanced in the concurring opinion seem untenable. (1) It is irrelevant that the manager of the private concern which operated the Camp Curry facility suggested the use of peepholes, and that the carpenter who cut them was a company employee, for the record is clear that the holes were cut and the surveillance conducted by agreement between the company manager and a United States ranger. And in any event, it was officers of the United States and not private persons who conducted the search and secured the evidence. (2) A warrantless search of a protected area is not a permissible choice either for management officials or law enforcement officers, no matter how clear it may be that the premises are being used for an unlawful purpose. Probable cause may authorize the issuance of a search warrant; it cannot alone justify a search without one. Jones v. United States, 357 U.S. 493, 497–498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce

the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent." Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). See also Agnello v. United States, 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Eng Fung Jem v. United States, 281 F.2d 803, 804, 86 A.L.R.2d 981 (9th Cir. 1960).

The convictions were based upon evidence secured in violation of appellants' constitutional rights and should be reversed.