UNITED STATES of America

v.

James N. ROBERTSON.

Crim. No. 86–35–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

July 14, 1986.

Louis W. Kershner, William O. Hawkins, Virginia Beach, Va., for plaintiff.

Craig Phifer, III, Sp. Asst. U.S. Atty., Norfolk, Va., for defendant.

## OPINION

WALTER E. HOFFMAN, Senior District Judge.

James N. Robertson ("Robertson") appeals from the decision of the United States Magistrate finding him guilty of driving a motor vehicle on federal property while under the influence of alcohol and imposing a fine of $250.00, a special assessment of $25.00, a suspended sentence of incarceration for thirty days, probation of one year, and suspension of his driving privileges for six months. The Magistrate did not rule on a request for a restricted license because Robertson decided not to make the request until he had a chance to appeal from the Magistrate's decision. For the reasons stated below, the Magistrate's decision is affirmed in all respects except for the imposition of the $25.00 special assessment, which is vacated.

### I. Facts

At about 1:00 a.m. on Sunday, March 2, 1986, Robertson pulled his car up to the gate at the Fleet Combat Training Center, Dam Neck Base, in Virginia Beach, Virginia. The guard on duty, Patrolman Bowler, checked Robertson's identification card. Detecting a strong odor of alcohol, Patrolman Bowler asked Robertson to get out of the car and perform field sobriety tests. Robertson failed to touch his nose with his left index finger; he also had difficulty reciting the alphabet. Consequently, Patrolman Bowler decided to have Robertson take a breathalyzer test.

Robertson consented to take the test, and a qualified breathalyzer technician at

the Oceana Naval Station performed the necessary steps. The test showed that the percentage of alcohol in Robertson's blood was .14 percent. When the defendant was given a copy of the certificate of breath alcohol analysis immediately after the test, it was regular in all respects except that the time of the test had been omitted. The omission was subsequently corrected, however, and the official copy of the certificate shows that the test took place at 1:35 a.m.

## II. Discussion

### A. Driving Under the Influence While on Federal Property

■ This prosecution has been brought *solely* under the Assimilative Crimes Act, 18 U.S.C. section 13, which incorporates the crimes of the state in which a federal enclave exists for purposes of prosecuting persons for acts committed on the federal enclave.[1] The state provision underlying this prosecution is Va.Code section 18.2–266, which makes it "unlawful for any person to drive or operate any motor vehicle ... (ii) while such person is under the influence of alcohol." *Id.* (Supp.1985).

A threshold matter in any prosecution under 18 U.S.C. section 13 is, of course, that the conduct in question has occurred on a federal enclave.[2] This threshold showing, as the Magistrate recognized, has been sufficiently established in this case. Patrolman Bowler testified that Robertson drove up to the main gate of the Dam Neck Base, territory over which the United States Government exercises jurisdiction. That uncontradicted testimony provides a

sufficient basis for prosecuting under the Assimilative Crimes Act. *See United States v. Lavender,* 602 F.2d 639, 641 (4th Cir.1979) ("Although defendants are correct in pointing out that the District Judge declined to take judicial notice that the [Blue Ridge] Parkway was so located this court may, and does, take judicial notice of commonly known facts, especially where there is testimony, as here, to the effect that the illegalities took place on the Parkway."); *cf. United States v. Johnson,* 726 F.2d 1018 (4th Cir.1984) (magistrate could take judicial notice of distances involved in alleged transportation of explosive devices because "geographical information is especially appropriate for judicial notice") (citing *Lavender* ).

Having established that Robertson drove his car on a federal enclave, this Court must decide whether the Magistrate correctly found that Robertson drove on the federal enclave while under the influence of alcohol. Robertson's attack on the Magistrate's finding hinges on the admission into evidence of the certificate of breath-alcohol analysis. He argues that the addition of the time the test had been administered, after Robertson had been given a copy of the certificate that omitted the time, violated the terms of the third paragraph of subsection (r1) in Va.Code section 18.2–268 (Supp.1985) (requiring, among other things, the time of the test to be on the certificate). As the Magistrate recognized, however, subsection (s) of the same statutory provision leaves no doubt that the certificate is admissible.[3] The requirement

---

**1.** The Assimilative Crimes Act provides as follows:

Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13 (1982).

**2.** Another threshold matter in prosecutions under 18 U.S.C. section 13 is whether a federal statute makes criminal the same conduct proscribed under state law. If so, section 13 by its own terms cannot apply and the prosecution must proceed under the federal statute. The Assimilative Crimes Act applies here, however, because no federal statute expressly outlaws drunk driving. *See United States v. Walker,* 552 F.2d 566, 568 (4th Cir.), *cert. denied,* 434 U.S. 848, 98 S.Ct. 157, 54 L.Ed.2d 116 (1977).

**3.** Va.Code section 18.2–268(s) provides as follows:

(s) The steps herein set forth relating to the taking, handling, identification, and disposi-

of the time of the test on a certificate, as subsection (s) makes clear, is "procedural in nature." *But cf. Brooks v. City of Newport News,* 224 Va. 311, 295 S.E.2d 801 (1982) (invalid license of person administering test is matter of substance, not procedure, and is not waived by subsection (s)). Because "[s]ubstantial compliance" with requirements such as in subsection (r1) "shall be deemed sufficient," Va.Code § 18.2-268(s) (1982), this Court holds that the Magistrate properly admitted the certificate.

The certificate showed .14 percent of alcohol in Robertson's blood. Va.Code section 18.2–269(3) gives rise to a rebuttable presumption "that the accused was under the influence of alcoholic intoxicants" if the percent of alcohol in the accused's blood is over .10 percent. *Cf.* Va.Code Section 18.-2–266(i) (percentage of alcohol in blood that is .15 percent or over gives rise to irrebuttable presumption of alcoholic influence).[4] Because Robertson has not rebutted the presumption of alcoholic influence created by the showing of .14 percent of alcohol in his blood, this Court must conclude that the Magistrate correctly found him guilty of driving while under the influence of alcohol.

### B. *Special Assessment*

A more difficult question that necessarily arises in every Assimilative Crimes Act case, wherever prosecuted, concerns the applicability of the assessment provisions of 18 U.S.C. section 3013. Although the question could be disposed of summarily in this case, the Court discusses the matter at length in order to refine the appropriate analysis. As the discussion shows, the applicability of the federal assessment provisions apparently depends on the terms of a state's victim compensation law.

Added to title 18 by section 1405(a) of the Comprehensive Crime Control Act of 1984, the "special assessments" provisions of 18 U.S.C. section 3013 constitute the source of income for the recently created crime victims fund. *See* S.Rep. No. 497, 98th Cong., 2d Sess. 13, *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3607, 3619–20. The amounts of the assessments, which are imposed "on any person convicted of an offense against the United States," are as follows:

(1) in the case of a misdemeanor—
   (A) the amount of $25 if the defendant is an individual; and
   (B) the amount of $100 if the defendant is a person other than an individual; and
(2) in the case of a felony—
   (A) the amount of $50 if the defendant is an individual; and
   (B) the amount of $200 if the defendant is a person other than an individual.

Victims of Crime Act of 1984, Pub.L. No. 98–473, § 1405(a), 98 Stat. 2174 (codified at 18 U.S.C.A. § 3013(a) (1985)). The section further provides that the "amount so assessed shall be collected in the manner that fines are collected in criminal cases." *Id.* § 3013(b).

Because the special assessments apply to "any person convicted of an offense against the United States," they should be imposed on anyone convicted of an assimilative crime unless the terms of the Assimilative Crimes Act suggest otherwise. The only court to have considered the issue, the United States Court of Appeals for the

---

tion of blood or breath samples are procedural in nature and not substantive. Substantial compliance therewith shall be deemed to be sufficient. Failure to comply with any one or more of such steps or portions thereof, or a variance in the results of the two blood tests shall not of itself be grounds for finding the defendant not guilty, but shall go to the weight of the evidence and shall be considered as set forth above with all the evidence in the case, provided that the defendant shall have the right to introduce evidence on his own behalf to show noncompliance with the aforesaid procedure or any part thereof, and that as a result his rights were prejudiced.

**4.** A bill recently signed into law by Governor Gerald L. Baliles lowers the point at which the presumption of intoxication becomes irrebuttable from .15 percent to .10 percent. *See* 1986 Va.Acts, ch. 635, at ——. The new provision does not apply to this case.

Tenth Circuit, held the assessments inapplicable in a prosecution for breaking and entering a dwelling located on a federal enclave in New Mexico. *United States v. Mayberry,* 774 F.2d 1018 (10th Cir.1985). The Tenth Circuit in *Mayberry* found that the special assessment provisions of 18 U.S.C. section 3013 are penal in nature. *See id.* at 1021; *see also United States v. Ramos,* 624 F.Supp. 970, 973 (S.D.N.Y. 1985). They place an additional burden on the defendant, can be imposed only after a conviction, impose a higher assessment for the more serious category of offenses, and are collected in the same way that fines are collected in criminal cases. 774 F.2d at 1021. As a form of punishment, the court reasoned, the assessments could not be imposed unless the law of the state in which the federal enclave exists contains a similar form of punishment. *See id.* at 1020 ("The Assimilative Crimes Act makes clear that an individual who commits an act on a federal reservation which is illegal under the laws of the state where the enclave is located 'shall be guilty of a like offense *and subject to a like punishment*' under the federal law" (quoting 18 U.S.C. § 13; emphasis added by Tenth Circuit)). Be-

cause New Mexico had no similar provision for collecting special assessments, the Court decided that "imposition of the assessment *in this case,* would be violative of the Assimilative Crimes Act." *Id.* (emphasis in original).

This Court, however, confronts a different case. Virginia law contains a statutory scheme with a provision that resembles the federal special assessments. *See* 1976 Va. Acts, ch. 605, at 759–64 (codified at Va. Code §§ 19.2–368.1 to 19.2–368.18 (Virginia's statutory scheme to compensate victims of crime)). If the provisions of the Virginia statute are punitive, and if they constitute punishment similar to that imposed by 18 U.S.C. section 3013, then the special assessments of section 3013 may properly be levied on a person convicted of an offense committed on a federal enclave in Virginia.

The Virginia scheme for compensating crime victims revolves around a compensation fund from which successful claimants are paid. *See* Va.Code § 19.2–368.18 (1983 & Supp.1985). The income in the fund derives mainly from an "additional cost" of $15.00 levied on persons convicted of felonies and certain misdemeanors.[5] *See id.*

---

**5.** Until recently, express language in the Virginia act prohibited the payment of claims from any source other than monies collected from convicted criminals. *See* Va.Code § 19.2–368.18 E (1983) ("Payment of claims under this chapter shall be limited to the funds available in the Criminal Injuries Compensation Fund as collected during the preceding fiscal year and any funds remaining unrewarded from any prior fiscal year.") A 1985 amendment rewrote the above-quoted sentence as follows: "All revenues deposited into the Criminal Injuries Compensation Fund, and appropriated for the purposes of this chapter, shall be immediately available for the payment of claims." 1985 Va.Acts, ch. 230, at 281 (codified at Va.Code § 19.2–368.18 E (Supp.1985)).

The provision was rewritten apparently to remove any limitations on the receipt of federal funds. Federal assistance became available with the passage of the Comprehensive Crime Control Act of 1984. *See* Victims of Crime Act of 1984, Pub.L. No. 98–473, §§ 1401–1406, 98 Stat. 2170–75 (codified at 18 U.S.C.A. § 3012 (1985), 42 U.S.C.A. §§ 10601–10604 (1986 pamphlet)). The Virginia General Assembly considered the consequences of receiving federal funds. *See Report on the Potential Impact of*

*Participation in the Federal Program for Compensation of the Victims of Crime,* memorandum from Kathy J. Reynolds, Legislative Staff Analyst, to Members of the Subcommittee on General Government (December 16, 1985). The decision to accept federal funds is reflected by the 1985 amendment to Va.Code section 19.2–368.18 E and by an amendment during the last session of the Virginia General Assembly. *See* 1986 Va.Acts, ch. 442, at —— (amending Va. Code § 19.2–368.3, concerning the powers and duties of the commission that administers the victim compensation scheme, to give the commission the power "[t]o accept from the government of the United States grants of federal moneys for disbursement under the provisions of this chapter").

Another reason for the 1985 amendment to 19.2–368.18 E may simply have been that the limitation of using funds from prior years could have proved burdensome. In any event, the amendment did not fundamentally alter the structure and operation of Virginia's victim compensation fund. Funds from general state resources have been appropriated for use in the victim compensation program only once, and that appropriation appears to have been an emergency measure designed to relieve the pro-

Whether this "additional cost" constitutes a penalty is, as has been suggested, a critical factor in determining the applicability of the federal special assessment provisions. Given the absence of legislative history on Virginia's victim compensation scheme,[6] the Court must attempt to divine legislative intent by analyzing the statutory scheme itself and by comparing the scheme with those of other jurisdictions.[7]

Reading the introductory provision in Virginia's scheme by itself, one might be led to conclude that the scheme is wholly compensatory. *See* Va.Code § 19.2–368.1 (1983). The provision states, as a finding of the General Assembly, that "there is a need for governmental financial assistance for ... victims of crime." The provision concludes as follows: "Therefore, it is the intent of the General Assembly that aid,

care and support be provided by the Commonwealth as a matter of moral responsibility for such victims of crime." *Id.* The fact remains, however, that the Virginia scheme also has a punitive element. The income for the victim compensation fund derives mainly from the pocket books of convicted criminals. *See supra* note 5. The $15.00 "additional cost," in this sense, resembles a restitutionary fine, which is a classic form of punishment. *See* Schafer, *Victim Compensation and Responsibility*, 43 S.Calif.L.Rev. 55, 65 (1970) ("[R]estitution ... allocates responsibility to the offender; a claim for restitution by the criminal is penal in character, and thus manifests a correctional goal in the criminal process."); Note, *Criminal Law—Victims' Rights—Virginia Adopts Statute to Compensate the Victims of Crime*, 11

---

gram of overdue claim awards. *See* 1980 Va. Acts, ch. 760, at 1380 (appropriating $150,000.00 in general funds, with the following direction: "Notwithstanding the second sentence of § 19.-2–368.18 E, Code of Virginia, the general fund shall be used only to pay claim awards which have not been paid as of June 30, 1980."). By contrast, all of the $725,409.00 deposited in the compensation fund from October 1, 1984, through September 30, 1985, was derived from the $15.00 "additional cost" levied on convicted criminals according to Va.Code section 19.2–368.18. Letter from Gerald L. Baliles to Charles M. Hollis, Program Manager, Office of Victims of Crime, U.S. Department of Justice (June 20, 1986) (certifying expenditures and revenues of the state program, as required by the federal act).

The addition of federal funds to the victim compensation till, moreover, should not fundamentally alter the funding of state programs because the amount of federal assistance will be, at most, thirty-five percent of the amount awarded by the state during the preceding fiscal year. *See* 42 U.S.C.A. § 10602 (1986 pamphlet); *see also* The Arlington Journal, June 10, 1986, A1, at A10 (indicating that Virginia has in 1986 received its first federal grant, in the amount of $186,000.00, but that the Director of Virginia's Crime Victim Compensation Program, Robert W. Armstrong, fears that this money "may be cut 65 percent under a plan before Congress").

**6.** Although no formal legislative history on Virginia's victim compensation act exists, a comparison of the act with a counterpart bill that did not pass offers evidence of legislative intent. House Bill No. 454, sponsored by Wyatt B. Durrette, Jr., and seven others, was introduced and considered at roughly the same time as House

Bill No. 1093, sponsored solely by John L. Melnick. The major difference between Melnick's bill and Durrette's bill concerned the method of funding the compensation program: Melnick's bill relied solely on the "additional cost" of $10.00 (raised in 1980 to $15.00, *see* Va.Acts, ch. 521, at 614), assessed each convicted criminal, whereas Durrette's bill relied on appropriations from general state funds. The $10.00 additional cost paid by convicted criminals under Durrette's bill was "to be deposited in the general fund of the State Treasury." The funds collected from the assessment of the additional costs would therefore offset part of any appropriations made under the Durrette bill. Nevertheless, the funding structure of Durrette's bill depended on appropriations, which means that Virginia taxpayers would have been forced to share at least some of the burden of maintaining the program. The Durrette bill, therefore, was closer to a compensatory type of compensation scheme than was the Melnick bill. *Compare infra* note 10 (compensation schemes funded solely or mainly from convicted criminals' payments, as proposed in Melnick's bill, which reflect strong restitutionary element) *with infra* note 11 (compensation schemes funded through a combination of general state funds and convicted criminals' payments, as proposed in Durrette's bill, which reflect mixed compensatory and restitutionary elements).

**7.** Even though this Court happens to interpret and apply state law in pursuing the meaning of "punishment" in 18 U.S.C. section 13, the inquiry remains a federal question. *See Johnson v. Yellow Cab Co.*, 321 U.S. 383, 391, 64 S.Ct. 622, 626, 88 L.Ed. 814 (1944); *United States v. Best*, 573 F.2d 1095, 1098 (9th Cir.1978).

U.Rich.L.Rev. 679 (1977) (concluding that Virginia's victim compensation scheme contains both compensatory and restitutionary elements) [hereinafter cited as Note, *Virginia Adopts Statute*]; *see also* Senate Document No. 15, *Report of the Joint Subcommittee Studying Crime Victims' Compensation to the Governor and the General Assembly of Virginia* 3 (January 1986) (characterizing Virginia's compensation scheme as "collective restitution").

Comparison of Virginia's statutory scheme with those of the forty-two other jurisdictions that have victim compensation schemes [8] also suggests that Virginia's scheme has, at least in part, a punitive element. Victim compensation statutes generally fall into three categories: (1) schemes funded from general state resources; [9] (2) schemes funded solely, or mainly, from monies paid by convicted criminals; [10] and (3) schemes funded by a

**8.** *See infra* notes 9–11; *see also* Arkansas' statute, *infra* this footnote, which is a victim compensation scheme of a unique nature. The jurisdictions that do not have victim compensation statutes do have some form of restitution, which typically is within the discretion of the sentencing judge to impose. *See* Ga.Code Ann. §§ 17–14–1 to 17–14–16 (Michie 1982 & Supp.1985); Idaho Code Ann. §§ 19–5301 to 19–5306 (Bobbs-Merrill 1979 & Supp.1985); Maine Rev.Stat.Ann. ch. 17A, §§ 1321 to 1331 (West 1983 & Supp. 1985); Miss.Code Ann. §§ 99–37–1 to 99–37–21 (Supp.1985); N.H.Rev.Stat.Ann. §§ 651:62 to 651:67 (Equity Supp.1983); S.D. Codified Laws Ann. §§ 23A–28–1 to 23A–28–12 (Allen Smith 1969 & Supp.1985); 13 Vt.Stat.Ann. § 7043 (Supp.1985). *But see* Ark.Stat.Ann. §§ 43–2350 to 43–2360 (Michie Supp.1985) (mandatory restitution to specific victim); Iowa Code Ann. §§ 910.1 to 910.15 (West Supp.1985) (same).

**9.** Alaska Stat.Ann. §§ 18.67.010 to 18.67.162 (1981 & Supp.1985); Hawaii Rev.Stat.Ann. §§ 351–1 to 351–70 (1976 & Supp.1984); Smith-Hurd Illinois Stat.Ann. ch. 70, ¶¶ 71–90 (Supp. 1985); Mass.Gen.Laws Ann. ch. 258A, §§ 1–9 (West Supp.1986); Mich.Compiled Laws Ann. §§ 18–351 to 18–368 (West 1981); Minn.Stat. Ann. §§ 611A.51 to 611A.68 (West Supp.1986); Neb.Rev.Stat. §§ 81–1801 to 81–1842 (1981); N.M.Stat.Ann. §§ 31–22–1 to 31–22–22 (Michie 1981 & Supp.1985); McKinney's Consol.Laws of N.Y.Ann., Exec.Law §§ 620–635 (West 1982 & Supp.1986); N.C.Gen.Stat. §§ 15B–1 to 15B–22 (Michie 1983); N.D.Century Code Ann. §§ 65–13–01 to 65–13–20 (Allen Smith 1985); Wis.Stat. Ann. §§ 949.001 to 949.18 (West 1982 & Supp. 1985).

**10.** Ariz.Rev.Stat. §§ 41–2401 to 41–2403 (West 1985) ("penalty assessment" of $100.00 for all felonies); Calif. Government Code §§ 13959 to 13969.1 (West 1980 & Supp.1986) ("penalty assessment" of $5.00 added onto every $10.00 of fines or the like and, if a felony, from $100.00 to $10,000.00 depending on gravity of offense); Colo.Rev.Stat.Ann. §§ 24–4.1–100.1 to 24–4.1–304 (Bradford Supp.1985) ("cost" of $75.00 for felonies, $40.00 for misdemeanors, $35.00 for Class 1 traffic offenses, $25.00 for Class 2 traffic offenses); Conn.Gen.Stat.Ann. §§ 54–202 to 54–

218 (West 1985) ("cost" of $20.00 for felonies and $15.00 for misdemeanors); Del.Code Ann. ch. 11, §§ 9001–9017 (Michie 1979 & Supp.1984) (15% of every fine, penalty, or forfeiture); Ind. Burn's Stat.Ann. §§ 16–7–3.6–1 to 16–7–3.6–17 (1983 & Supp.1985) ($15.00 "court costs" for all felonies and Class A misdemeanors); Kan.Stat. Ann. §§ 74–7301 to 74–7318 (1985) (although Kansas' victim compensation fund traditionally has received appropriations from general state funds, the program will after July 1, 1986 be funded only from a $2.00 assessment added to the docket fees in all cases as well from federal assistance); Vernon's Mo.Stat.Ann. §§ 595.010 to 595.070 (West Supp.1986) ("judgment" of $36.00 for every sentence of imprisonment, fine, or detention while on probation, as well as some alcohol-related offenses); Nev.Rev.Stat. Ann. §§ 217.010 to 217.270 (Michie 1986) (assessments arrived at through claim to forfeited bail deposits and other forfeited assets); Pa.Stat. Ann. tit. 71, §§ 180–7 to 180–7.18 (Purdon pamphlet 1985) (although Pennsylvania's victim compensation fund has in the past received some appropriations from general state funds, which were deferred by income generated from a "mandatory costs" of $10.00 and later $15.00, the program will after July 1, 1986 be funded only through the income generated from the $15.00 "mandatory cost" and federal funds); R.I.Gen.Laws §§ 12–25–1 to 12–25–14 (1981 & Supp.1985) ("court costs" of $100.00, or 10% of fine, whichever greater, for felony punishable by 5 or more years of incarceration; $60.00, or 10% of fine, whichever greater, for felony punishable by less than 5 years incarceration; $20.00, or 10% of fine, whichever greater, for misdemeanor); Tenn.Code Ann. §§ 29–13–101 to 29–13–208 (Michie 1980 & Supp.1985) ($50.00 for crimes against the person and $26.50 for other offenses); Texas Rev.Civ.Stat.Ann. art. 8309–1, §§ 1–18 (Supp.1986) ("cost" of $20.00 for a felony, $15.00 for a misdemeanor, and $3.00 for other misdemeanors except traffic offenses); Utah Code Ann. §§ 41–25–1 to 41–25–7 (Allen Smith Supp.1985) ($100.00 fee for driving while intoxicated, the funds of which are available to victims of drunken driving) and S.Bill No. 96, 1986 Utah Laws —— (25% "surcharge" on all fines, penalties, and forfeitures, available

combination of general state resources and monies paid by convicted criminals.[11] The statutory schemes funded solely from state resources clearly are compensatory in nature. See Schafer, supra, at 65 ("Compensation is a responsibility assumed by society; it is civil in character, and thus represents a non-criminal welfare goal."); Canadian Corrections Association, "Compensation to Victims of Crime and Restitution by Offenders," in Considering the Victim: Readings in Restitution and Victim Compensation [hereinafter cited as Canadian Corrections Association Report], at 412 (1975) (compensation "refers to payments by the state to the victim of a crime"; restitution "refers to the contribution made by the criminal"); Note, Virginia Adopts Statute, at 679 n. 6 ("State statutes which award compensation from funds allocated by the legislature are true compensation statutes."). Conversely, victim compensation schemes funded wholly or partially through monies paid by convicted criminals are restitutionary. See Schafer, supra at 65–67; Canadian Corrections Association Report, supra, at 412–13; Note, Virginia Adopts Statute, at 679–80; see also supra note 5 (indicating that the Virginia legislature wanted a restitutionary, rather than a compensatory, scheme). As such, these statutes are, to a greater or a lesser degree, punitive in nature. Therefore, this Court concludes that the "additional costs" mandated by the Virginia victim compensation statute is a form of punishment.[12]

to crime victims generally); Va.Code §§ 19.2–368.1 to 19.2–368.18 (Michie 1983 & Supp.1985) ($15.00 "additional cost" for felonies and certain misdemeanors); W.Va.Code Ann. §§ 14–2A–1 to 14–2A–28 (Michie 1985 & Supp.1985) ($3.00 fee for felony or misdemeanor).

11. Ala.Code §§ 15–23–1 to 15–23–23 (Michie Supp.1985) (state funds plus "costs" of $15.00 for felonies, $10.00 for misdemeanors, and $2.00 for traffic offenses, and plus "victim compensation assessment" of between $25.00 and $10,000.00 for all felonies); D.C.Code §§ 3–401 to 3–415 (Michie Supp.1985) (state funds plus "costs" of between $20.00 and $500.00 for felonies, and $10.00 for misdemeanors); Fla.Stat.Ann. 960.01 to 960.28 (West 1985 and Supp. 1986) (state funds plus "additional cost" of $20.00 for felony, misdemeanor, or traffic offense); Iowa Code Ann. §§ 912.1 to 912.13 (West Supp.1985) (state funds plus civil penalty of $100.00 assessed drunken drivers); Ky.Rev.Stat. §§ 346.010 to 346.190 (Michie 1983 & Supp.1986) (state funds plus "additional cost" of $10.00 for all offenses punishable by imprisonment); La.Rev.Stat.Ann. §§ 46:1801 to 46:1823 (West 1982 & Supp.1986) (state funds plus "cost" of not less than $50.00 for felonies and $7.50 for misdemeanors); Md.Ann.Code ch. 26A § 17 (Michie 1981 & Supp.1985) (state funds plus "additional cost" of $15.00 for any crime); Mont.Code Ann. §§ 53–9–101 to 53–9–133 (1985) (state funds plus 18% of fines assessed and bails forfeited); N.J.Stat.Ann. §§ 52–4B–1 to 42–4B–38 (West 1986) (state funds plus $25.00—$10,-000.00 for violent crimes resulting in injury or death, $25.00 for other crimes, and $10.00 for offenses of juvenile delinquency); Ohio Rev. Code Ann. §§ 2743.51 to 2743.72 (Page 1981 & Supp.1985) (state funds plus "costs" of $20.00 for felony and $6.00 for misdemeanor); Okla. Stat.Ann. ch. 21, §§ 142.1 to 142.20 (West 1983 & Supp.1985) (state funds plus "penalty" in form of "victim compensation assessment" of $25.00—$1,000.00 for felonies involving injurious conduct, $20.00—$500.00 for other felonies, and $20.00—$100.00 for misdemeanors); Ore. Rev.Stat.Ann. §§ 147.005 to 147.365 (Butterworth 1981) ("penalty assessment" of $50.00 for felonies, $20.00 for misdemeanors, and $40.00 for driving while intoxicated); S.C.Code Ann. §§ 16–3–1110 to 16–3–1340 (Law.Co-op 1985) (state funds plus 50% of assessments, restitution charges, and assessments imposed as a condition of probation); Wash.Rev.Code Ann. §§ 7.68.010 to 7.68.915 (Supp.1986) (state funds plus "penalty assessment" of $70.00 for felony or gross misdemeanor, and $45.00 for other misdemeanors); Wyo.Stat. §§ 1–40–101 to 1–40–119 (Supp.1985 state funds plus "surcharge" of $25.00 for felony, $15.00 for any misdemeanor punishable by 6 months incarceration, a $750.00 fine, or both).

   In this footnote and the previous two footnotes, the Court has categorized the funding of the state programs according to the terms of the state statutes. If appropriations from general state funds are possible within a given statute, the court assumes that appropriations have been made or will be made. Furthermore, the amounts of federal grants to state programs has not been calculated. See supra note 5 (indicating, in the last paragraph, that federal assistance will not fundamentally alter the funding of state programs.

12. The reasoning by which the Tenth Circuit in Mayberry decided that the federal assessments are punitive also supports the conclusion that the additional costs in Virginia's compensation scheme are punitive. First, the cost places an additional burden or penalty on the criminal defendant. Cf. Mayberry, 774 F.2d at 1021 (citing Ex parte Lange, 18 Wall. 163, 85 U.S. 163, 21

The applicability of the federal assessment provisions depends upon the answer to one further question: whether the federal special assessment and the Virginia additional cost are "like punishment" within the meaning of the Assimilative Crimes Act? The answer, if a satisfactory one exists at all, is elusive.

The cases discussing the meaning of the "like punishment" clause are unhelpful primarily because of their factual posture. More specifically, they typically deal with challenges to a sentence of incarceration rather than to the imposition of a fine. *See United States v. Binder,* 769 F.2d 595 (9th Cir.1985) (sentence of four concurrent seven-year sentences, the presumptive minimum for sexual offenses under Arizona law, affirmed because federal court in Assimilative Crimes Act case is "obliged to impose the applicable state sentence," although parole matters should be determined under federal law); *United States v. Pinto,* 755 F.2d 150 (10th Cir.1985) (sentence of two seven-year terms, with first term containing a mandatory confinement of two years before parole, affirmed regarding seven-year terms because "court must under § 13 sentence the defendant for a term of years according to the state statutes" but vacated regarding two-year mandatory confinement before parole because that is a federal matter); *United States v. Vaughan,* 682 F.2d 290 (2d Cir.) (sentence of eight years' imprisonment for burglary, the minimum for a second felony offender under New York law, and a minimum of four years incarceration before parole, affirmed as to eight-year sentence because of the "well established principle that a state statute that fixes the length of a prison term should control the sentence imposed by federal courts under the [Assimilative Crimes Act]" but vacated as to parole term because that is federal matter), *cert. denied,* 459 U.S. 946, 103 S.Ct. 261, 74 L.Ed.2d 203 (1982); *United States v. Hughes,* 542 F.2d 246 (5th Cir.1976) (sentence of thirty days in jail and $100.00 fine for driving while intoxicated, affirmed and defendant's request for revision of jail term rejected because it was "within the statutory limits" of Alabama law); *United States v. Irvin,* 13 M.J. 749 (A.F.C.M.R. 1982) (sentence of sixteen years' imprisonment, vacated because maximum sentence for child abuse under Colorado law was eight years), *vacated on other grounds,* 21 M.J. 184 (C.M.A.1986); *see also United States v. Smith,* 574 F.2d 988 (9th Cir.) (district court correct in imposing twenty-year sentence for rape according to state law, but wrong in imposing minimum confinement without parole because that is federal matter), *cert. denied sub nom. Williams v. United States,* 439 U.S. 852, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978); *United States v. Dunn,* 545 F.2d 1281 (10th Cir. 1976) (sentence of indeterminate confinement up to four years, under provisions of

---

L.Ed. 872 (1873)). Second, the additional cost can be imposed only after the defendant has been convicted of a specified offense. *See* Va. Code § 19.2–268.18 (Supp.1985); *cf. Mayberry,* 774 F.2d at 1021. Third, the additional cost is collected in the same way that fines are collected in criminal cases. *See Virginia District Court Accounting Manual* § 430.6, at 195 (July 1, 1983); *cf. Mayberry,* 774 F.2d at 1021.

In finding the federal assessments punitive, the court in *Mayberry* relied on a fourth factor: "the assessment of higher penalties for more serious crimes as an aspect of 'making the punishment fit the crime.'" *Mayberry,* 774 F.2d at 1021. This factor is inapplicable to the Virginia additional cost mechanism because section 19.-2–368.18 mandates a single amount for the specified offenses. The significance of the factor is, nevertheless, problematic in the context of the Virginia provision. The Virginia scheme ex-

cludes altogether from imposition of the additional cost defendants convicted of minor offenses. Whereas a defendant must pay the federal assessment even for misdemeanors such as traffic infractions, the most serious offense for which a defendant can be forced to pay Virginia's additional cost is a Class 2 misdemeanor. *See* Va.Code § 18.2–11 (1982) (punishable by confinement in jail for more than six months and a fine of not more than $500, either or both). Arguably, therefore, Virginia has adhered to the principle of fitting punishment to crime by excluding altogether offenses that the legislature has deemed minor. In any event, the restitutionary element of the Virginia scheme, as well as the other factors discussed in this footnote, lead the Court to the conclusion that the additional-cost provision of Virginia's victim compensation scheme is a form of punishment.

federal act, vacated because Colorado law allowed maximum imprisonment of twelve months); *cf. United States v. Sosseur,* 181 F.2d 873 (7th Cir.1950) (sentence of six months' imprisonment and $250.00 fine vacated as excessive because Wisconsin statute allowed only for imprisonment or a fine).

These cases also are not of assistance because of the superficial nature of their reasoning regarding the "like punishment" analysis. The conclusion that the period of imprisonment in an Assimilative Crimes Act case must be within the bounds of state law rests, as it must, on the "subject to a like punishment" clause of the Act. The meaning of "like punishment," however, has been hardly explored. For instance, the United States Court of Appeals for the Second Circuit stated in *Vaughan* that "[i]t is a well established principle that a state statute that fixes the length of a prison term should control the sentence imposed by federal courts under the [Assimilative Crimes Act]." 682 F.2d at 294. As support for this statement, the court cited *Fields v. United States,* 438 F.2d 205, 207 (2d Cir.), *cert. denied,* 403 U.S. 907, 91 S.Ct. 2214, 29 L.Ed.2d 684 (1971). *Fields,* however, did not even address the issue, but rather addressed the defendant's understanding of his plea agreement. In so doing, the court in *Fields* assumed that state law controlled the length of imprisonment for the assimilated crime. *See id.* The assumption may have been correct, but it offers little support for the broad statement made in *Vaughan,* much less an explanation of the "like punishment" clause.

Another superficial way of handling the relationship between state punishment and federal punishment has been to quote, almost as a self-evident pronouncement, the

following passage from an early U.S. Supreme Court opinion:

> [I]t is apparent that the statute, instead of fixing by its own terms the punishment for crimes committed on such reservations which were not previously provided for by a law of the United States, adopted and wrote in the state law, with the single difference that the offense, although punished as an offense against the United States, was nevertheless punishable only in the way and to the extent that it would have been punishable if the territory embraced by the reservation remained subject to the jurisdiction of the State.

*United States v. Press Publishing Co.,* 219 U.S. 1, 9–10, 31 S.Ct. 212, 214, 55 L.Ed. 65 (1911). *See, e.g., Dunn,* 545 F.2d at 1282 (quoting from the above passage). The Tenth Circuit in *Mayberry* cites *Press Publishing Co.* and *Dunn* as having conclusively determined the meaning of the "like punishment" clause.[13] "This language [the "like punishment" clause] has consistently been construed to require punishment only in the way and to the extent that the same offense would have been punishable if the territory embraced by the federal reservation or enclave where the crime was committed remained subject to the jurisdiction of the state." 774 F.2d at 1020.

The Tenth Circuit in *Mayberry* nevertheless had no opportunity to apply the "like punishment" clause. The court accepted the parties' stipulation that "New Mexico has no similar provision for collecting special assessments,"[14] 774 F.2d at 1020, and therefore the court had no state-law reference to compare with the federal provisions. Furthermore, courts such as the Tenth Circuit in *Mayberry* that have relied

---

13. In fact, the court in *Press Publishing Co.* never had the opportunity to answer a challenge to punishment. The district court had granted the defendant newspaper's motion to quash the indictment charging the newspaper with criminal libel under New York law. The Supreme Court affirmed the district court's decision to quash the indictment.

14. The parties appear to have been right because the New Mexico Crime Victims Reparation Act has, from its inception on July 1, 1981, been maintained wholly from general state funds. *See* 1981 N.M. Laws, ch. 325, § 22 (appropriating $1,800,000.00 from general funds for the purposes of carrying out the provisions of the act); *see also supra* note 9 (indicating that the New Mexico act is still maintained by appropriations from general funds).

on *Press Publishing Co.* as the definitive interpretation of "like punishment" have overlooked a key fact. The statute before the Supreme Court in *Press Publishing Co.* did not even contain the phrase "like punishment." Instead, the statute read as follows:

That when any offense is committed in any place, jurisdiction over which has been retained by the United States, or ceded to it by a State, or which has been purchased with the consent of a State for the erection of a fort, magazine, arsenal, dockyard, or other needful building or structure, the punishment for which is not provided for by any law of the United States, the person committing such offense shall upon conviction in a circuit or district court of the United States for the district in which the offense was committed, be liable to and *receive the same punishment* as the laws of the State in which such place is situated now provide for the like offense when committed within the jurisdiction of such State, and the said courts are hereby vested with jurisdiction for such purpose; and no subsequent repeal of any such state law shall affect any such prosecution.

Act of July 7, 1898, § 2, 30 Stat. 717 (emphasis added), *quoted in Press Publishing Co.*, 219 U.S. at 8, 31 S.Ct. at 213.

The "same punishment" language in the statute interpreted by the Supreme Court in *Press Publishing Co.* had been part of the Assimilative Crimes Act since Daniel Webster drafted the first version of the act based on a bill prepared by Justice Joseph Story.[15] *See* Act of March 3, 1825, ch. 65, § 3, 4 Stat. 115; *see also* Act of April 5, 1866, ch. 24, § 2, 14 Stat. 13; Revised Statutes, ch. 3, § 5391 (1873–1874); Act of July 7, 1898, ch. 576, § 2, 30 Stat. 717. Interpreting section 5391 of the Revised Statutes, which essentially carried forward the 1866 version of the Act, the Ninth Circuit concluded that an offense under the section 5391 was "punishable by the same penal-

ties which are inflicted under the laws of the state." *Sharon v. Hill*, 24 F. 726, (C.C.1885), *appeal dismissed*, 131 U.S. 438, 9 S.Ct. 799, 33 L.Ed. 223 (1888).

The phrase "same punishment" was changed to "like punishment" in the 1909 revision of the penal laws. The 1909 version of the Act read as follows:

Whoever, within the territorial limits of any State, organized Territory, or District, but within or upon any of the places now existing or hereafter reserved or acquired, described in section two hundred and seventy-two of this Act, shall do or omit the doing of any act or thing which is not made penal by any law of Congress, but which if committed or omitted within the jurisdiction of the State, Territory, or District in which such place is situated, by the laws thereof now in force would be penal, shall be deemed guilty of a like offense and be *subject to a like punishment;* and every such State, Territorial, or District law shall, for the purposes of this section, continue in force, notwithstanding any subsequent repeal or amendment thereof by any such State, Territory, or District.

Act of March 4, 1909, ch. 321, § 289, 35 Stat. 1145 (emphasis added). The "subject to a like punishment" clause has remained a part of the Act ever since. *See* Act of June 15, 1933, ch. 85, § 289, 48 Stat. 152; Act of June 20, 1935, ch. 284, 49 Stat. 394; Act of June 6, 1940, ch. 241, 54 Stat. 234; Act of June 25, 1948, ch. 645, § 13, 62 Stat. 66 (codified at 18 U.S.C. § 13).

Determining the meaning of "like punishment" is not, therefore, so easy a matter as quoting *Press Publishing Co.*, which construed the "same punishment" clause in much that the same way that the Ninth Circuit in *Sharon* had earlier construed that clause. Nor is the matter resolved by stating that the Assimilative Crimes Act "embraces both the offense and punishment prescribed by state law." *United States v. Robinson*, 495 F.2d 30, 33 & n. 11 (4th Cir.1974) (citing *Press Publishing Co.*).

---

**15.** *See* W. Story, 1 *Life and Letters of Joseph Story* 297–98 (1851); *see also Press Publishing* *Co.*, 219 U.S. at 12, 31 S.Ct. at 215 (quoting Justice Story's commentary on the bill).

The question is *what* punishment is assimilated or, more specifically, what can be considered "like punishment." The word "like" could in this phrase mean "same," which would suggest that the 1909 revision did not substantially change the Act. *See* Oxford English Dictionary, Vol. 6, at 283 (1978) ("like" can mean "same"). Or "like" could mean "resembling" or "similar," which would suggest an important change in the meaning of the Act. *See id.* ("like" can mean "resembling" or "similar"); *see also* Black's Law Dictionary 834 (5th ed. 1979) ("like" can mean "exactly corresponding" or, conversely, "substantially similar").

The legislative history to the 1909 revision of the penal laws provides no clear answer to the question. A House Report expresses displeasure with a situation in which the federal government is bound by "inflexible" state laws in the administration of justice under the assimilated crimes provision.[16] On the other hand, discussions of the provision on the Senate floor suggest that the changed language was not meant to loosen conformity with state punishment. Senator Heyburn, a member of the Committee on the Revision of the Penal Laws, referred to the provision as "existing law in substance." Debates on Revision of Penal Laws, 60th Cong., 1st Sess. 42 Cong. Rec. 1191 (Jan. 28, 1908). Senator Sutherland, of the same Committee, also stated that "where an offense is made punishable by the law of a State the same law and the same punishment should apply when the act defined by the law is committed within a place under the exclusive jurisdiction of the United States, but within the State." *Id.* at 1194. Unfortunately, none of the discussion addresses the reason for the changed language.

Assuming that the change from "same punishment" to "like punishment" in the 1909 revision of the penal code was merely a stylistic revision, the interpretation of the 1898 act in *Press Publishing Co.* would be the best guidance available regarding the meaning of the present version of the "like punishment" clause. That interpretation suggested that an assimilated crime is "punishable only in the way and to the extent that it would have been punishable if the territory embraced by the reservation remained subject to the jurisdiction of the State." 219 U.S. at 10, 31 S.Ct. at 214. Within this framework, the federal assessment could be imposed in this case only to the extent of $15.00, the most that could be charged a defendant under the Virginia victim compensation scheme.

Such a result seems counterintuitive, or at least impractical. Although the result follows from the reasoning of *Press Publishing Co.*, it is not clear whether fines—especially unique fines such as the special assessments—must be treated in the same way as sentences of incarceration for purposes of the "like punishment" analysis. *But cf. United States v. Kendrick*, 636 F.Supp. 189 (E.D.N.C. 1986) (holding that "punishment in this court for an offense under N.C.G.S. § 138.1 [North Carolina's driving while intoxicated statute] cannot exceed a fine of $1,000 or imprisonment for a term not exceeding one year," the maximum punishment for a misdemeanor under 18

---

**16.** As the report states,

> Congress, by the enactment of an omnibus section of this kind, almost at one stroke of the pen, writes into its criminal code the laws of forty-five different State legislatures. It trusts itself to their protection blindly and without any knowledge of their scope or of their provisions. It relies upon these laws which it can neither create, alter, amend, nor repeal and which when adopted are rigid, inflexible, and incapable of being adapted to any change in its policy respecting the offenses denounced by them. We know little of the adequacy of these laws for our protection. Many of the States in the Union enjoy, by inheritance or otherwise, the benefits of a common law, some by constitutional provisions; some by general legislative enactments; some by judicial construction. They have, therefore, independent of any statutory enactments, the power to indict and punish all immoral and unlawful acts tending to injure the community. They may, and some of them do, rely upon these, and therefore have no statutes prohibiting serious offenses of which the United States Government under these general provisions could avail itself for its protection.

H.R. 3200, 59th Cong., 1st Sess. 113 (1906).

U.S.C. section 1, because to allow the greater punishment that could be imposed under state law would conflict with the federal policy of limiting U.S. Magistrates' nonconsensual jurisdiction to that allowed under the federal definition of a misdemeanor); *cf. also United States v. Patmore*, 475 F.2d 752, 754 n. 1 (10th Cir.1973) (Lewis, Chief Judge, concurring) (indicating that a fine could change analysis involving sentences of incarceration); Note, *The Federal Assimilative Crimes Act*, 70 Harv.L.Rev. 685, 693 (1957) ("If ... a fine is provided by state or federal law, the computation [of the respective state or federal punishment] may be complicated because of the difficulty in measuring the relationship of a fine to imprisonment.").

A better reason may exist for applying the federal assessments in full. The provisions of state law are not applied through the Assimilative Crimes Act if the state law provision would conflict with federal policy. *See King v. Gemini Food Services, Inc.*, 438 F.Supp. 964, 966 (E.D.Va.1976), *aff'd*, 562 F.2d 297 (4th Cir.1977) (per curiam) (adopting district court's reasoning), *cert. denied sub. nom. King v. Public Service Employees Local Union 572*, 434 U.S. 1065, 98 S.Ct. 1242, 55 L.Ed.2d 766 (1978). *King* dealt with a Virginia law governing relations in the workplace that conflicted with federal labor policy. At least three United States Court of Appeal have, in a similar way, refused to impose punishment under state law because to do so would impinge on federal policy concerns. *See United States v. Pinto*, 755 F.2d 150, 154 (10th Cir.1985); *United States v. Vaughan*, 682 F.2d 290, 294–95 (2d Cir.1982), *cert. denied*, 459 U.S. 946, 103 S.Ct. 261, 74 L.Ed.2d 203 (1982); *United States v. Smith*, 574 F.2d 988, 992–93 (9th Cir.1978); *cf. United States v. Kendrick*, 636 F.Supp. 189 (E.D.N.C. 1986) (complete incorporation of North Carolina provisions for punishing drunken drivers, which allow up to two years of imprisonment, would conflict with

federal policy of limiting U.S. Magistrates' jurisdiction to the federal definition of a misdemeanor, which allows no more than a fine of $1,000 or imprisonment for no more than one year).

The Tenth Circuit in *Pinto*, the Second Circuit in *Vaughan*, and the Ninth Circuit in *Smith* each rejected state provisions requiring minimum incarceration before parole. The courts did not dispute that such state provisions are "punishment" that must be applied under the Assimilative Crimes Act absent countervailing federal policy. Instead, the courts held that the minimum-confinement provisions should be ignored because they conflict with federal policy. Significantly, the policy concerns underlying these holdings were tied not to a statutory infrastructure such as the National Labor Relations Act discussed in *King*, but rather to the more general need for uniformity in the administration of federal prisons. *See Pinto*, 755 F.2d at 154; *Vaughan*, 682 F.2d at 294; *Smith*, 574 F.2d at 992. Congress, therefore, could not have intended that state punishment in the form of the minimum-confinement provisions should be incorporated through the Assimilative Crimes Act. *See Pinto*, 755 F.2d at 154; *Vaughan*, 682 F.2d at 294; *Smith*, 574 F.2d at 992.

Similarly, limitation of the federal assessments to the terms of state law would produce an anomolous situation. Defendants convicted of an assimilative crime in Virginia would pay a $15.00 special assessment, whereas defendants convicted of other federal crimes would have to pay $25.00 in the case of a misdemeanor and $50.00 in the case of a felony. On a broader plane, the assessments could vary anywhere from $3.00 to $10,000.00 depending on whether the assimilative crime occurred on a federal enclave in one of the thirty jurisdictions with victim compensation schemes containing assessment provisions.[17] *See supra* notes 10 & 11.

---

**17.** The applicability of the federal assessments would depend, of course, on the state assessment provision being found punitive, as Virgin-

ia's provision has been found punitive. *See supra* notes 5–11 and accompanying text.

The limited assessments in Assimilative Crimes Act cases would have to be collected and processed in the same way that the standard federal assessments are. The $15.00 assessment would be deposited in the federal crime victims fund and administered under the provisions governing that fund. *See* 42 U.S.C.A. §§ 10601 to 10604 (1986 pamphlet).[18] Victims of assimilative crimes, moreover, will presumably claim victim compensation benefits under federal law although they could make a plausible claim, at least under Virginia law, to state compensation.[19] Because limitation of the special assessments to varying amounts under state law is at odds with the uniform administration of the federal victim compensation program, of which the special assessments are a part, Congress almost certainly did not intend that the special assessments should be modified by the Assimilative Crimes Act.

In concluding this discussion of the federal assessments, one point needs to be clarified. If the federal policy reflected in the administration of the federal victim compensation program is recognized, the terms of state law would not matter. Federal law would control, and the Assimilative Crimes Act would be inapplicable. *See King*, 438 F.Supp. at 966, *aff'd*, 562 F.2d 297 (4th Cir.1977), *cert. denied sub. nom. King v. Public Service Employees Local Union 572*, 434 U.S. 1065, 98 S.Ct. 1242, 55 L.Ed.2d 766 (1978). Accordingly, if this view prevails, *Mayberry* must be rejected because the Tenth Circuit chose not to rely on federal policy.[20]

18. These provisions contain guidelines by which federal funds can be distributed to state victim compensation programs. Virginia has chosen to receive federal funds. *See supra* note 5. Ironically, then, limitation of the federal assessments in Assimilative Crimes Act cases could lead to reduced assistance from the federal government.

19. Former Va.Code section 19.2–368.4 C provided that "[a] claimant, to recover under this chapter, shall be at the time of the injury a resident of this Commonwealth, or resident of a state which has enacted laws similar to this chapter affording rights of recovery to Virginia residents...." The provision was recently repealed, presumably to remove any residency requirements on a claimant. *See* 1986 Va.Acts, ch. 422, at —— (repealing Va.Code § 19.2–368.4 C). Furthermore, "crime" is defined for purposes of the Virginia scheme, as "an act committed by any person in the Commonwealth of Virginia which would constitute a crime as defined by the Code of Virginia or at common law." Va.Code § 19.2–368.2 (Supp.1985). *But see* Va.Code § 19.2–368.12 C(2) (providing for reduction of award by amount of payments from any other public or private source).

20. The discussion of special assessments to this point has assumed that the federal assessments, if they are to apply, must meet the terms of the Assimilative Crimes Act. That assumption· is not necessarily correct. Whereas the text accompanying this footnote explains one rationale for rejecting the analysis applied in *Mayberry,* this footnote explains an alternative rationale.

The Tenth Circuit in *Mayberry* held that the assessments are "punishment" within the terms of the Assimilative Crimes Act. *See supra.* An argument exists, however, that the assessments are not "punishment" of a type intended to be covered by the Assimilative Crimes Act. This argument hinges on the difference between the assessments and more traditional forms of punishment such as fines or sentences of incarceration.

Unlike a fine or sentence of incarceration, the assessments are not integrally related to the offenses for which the assessments are imposed. Concededly, the amount of a federal assessment is higher for a felony than for a misdemeanor. Beyond that, however, the imposition of. the assessment bears no relation to the type or severity of the offense that triggered the assessment. When one considers the policy basis for the Assimilative Crimes Act, the special nature of the assessment provisions arguably takes them from under the operation of the Act.

Since its enactment, one of the main purposes for having the Assimilative Crimes Act has been to conform the law of federal enclaves to that of state law. Traditionally, the concern has been that crimes would go unpunished on federal enclaves without some provision incorporating state law. As Justice Story commented in 1816 on the eleventh section of a bill drawn by himself that later became the basis for the first version of the Assimilative Crimes Act:

This is the most important section of the whole bill. The criminal code of the United States is singularly defective and inefficient. There are, in the statutes of the United States, prohibitions against doing some acts, and mandates to do others, which have no penalties annexed to them. But this is a very small grievance. Few, very few, of the practical crimes, (if I may so say,) are now punishable by statutes, and if the courts have no general common law jurisdiction, (which is a vexed question,) they are wholly dispunishable.

Nevertheless, the Court will follow the *Mayberry* analysis in this case.[21] That analysis, as shown, leads to the conclusion that the federal assessments can apply if the state has a similar form of punishment.

> The State Courts have no jurisdiction of crimes committed on the high seas, or in places ceded to the United States. Rapes, arsons, batteries, and a host of other crimes, may in these places be now commited with impunity. Surely, in naval yards, arsenals, forts, and dockyards, and on the high seas, a common law jurisdiction is indispensable. Suppose a conspiracy to commit treason in any of these places, by civil persons, how can the crime be punished? These are cases where the United States have an exclusive local jurisdiction. And can it be less fit that the Government should have power to protect itself in all other places where it exercises a legitimate authority? That Congress have power to provide for all crimes against the United States, is incontestable. The only question is, whether this is to be done by passing laws in detail respecting every crime in every possible shape, or shall give the Courts general jurisdiction to punish wherever the authority of the United States is violated, and leave the Courts to settle this by legal constructions, upon common law principles. In my judgment, the former course is utterly impracticable. Crimes are so various in their nature and character, and so infinitely diversified in their circumstanceŝ, that it is almost impossible to enumerate and define them with the requisite certainty. An ingenious rogue will almost always escape from the text of the statute book. But how much more certain is the common law. Its flexibility in adapting itself to all the circumstances of the various cases is wonderful. And it is precisely for this reason, that it ascertains crimes, not by the words of a positive law, but by a text applicable solely to the question, whether they violate public rights of public policy. The redress is therefore coextensive with the mischief.

W. Story, 1 *Life and Letters of Joseph Story* 297–98 (1851), *quoted in Press Publishing Co.* 219 U.S. at 12, 31 S.Ct. at 215; *see also* Gales & Seaton's Register of Debates of Congress, Vol. 1, Jan. 7, 1825, at 154–55 (Daniel Webster, who sponsored the first version of the Act, making a similar argument).

By maintaining in the Assimilative Crimes Act the provision that defendants will receive punishment according to state law, Congress has ensured that these defendants will receive punishment appropriate to the offense or, as Justice Story put it, "redress . . . coextensive with the mischief." Whether one refers to "same punishment" or "like punishment," the idea remains unchanged. *See supra* text accompanying note 15. That is not to say, however, that Congress

For most offenses in Virginia, that would be true. It is not true, however, of drunken driving offenses because such offenses are excepted from Virginia's "additional cost" provision.[22] Therefore, as in *Mayber-*

necessarily meant to exclude other forms of punishment in Assimilative Crimes Act cases, as long as a legitimate basis exists in federal law for imposing another form of punishment.

The federal assessments, as already stated, are not a classic form of punishment because they generally are unrelated to the type or severity of the offense committed. As a Senate Report explains, "The purpose of imposing nominal assessment fees is to offset the cost of the new [victims assistance] programs authorized under S.2423. Although substantial amounts will not result, these additional amounts will be helpful in financing the program and will constitute new income for the federal government." S.Rep. No. 497, 98th Cong., 2d Sess. 13–14 (1984), *reprinted in* 1984 U.S.Code Cong. & Ad. News 3619–20. The funds collected through the assessments go to both state and federal victim compensation programs. *See* 42 U.S.C.A. §§ 10601–10604 (1986 pamphlet); *see also supra* note 5.

Prohibiting the assessment of monies designed to achieve such unimpeachable social welfare goals seems, at the least, a peculiar result. For that reason, this Court believes that the court in *Mayberry* may have read too much into the language of the Assimilative Crimes Act. By providing for "same punishment"/"like punishment," Congress may have merely intended to assure that state provisions for punishment would remain linked to the offenses for which the punishment is imposed. If they are punishment at all, provisions such as the federal assessments are a special kind of punishment with legitimate purposes unrelated to the offenses committed by a given defendant. Because the Assimilative Crimes Act arguably concerns only the punishment as it relates to the assimilated offense, the federal assessments may not be subject to the terms of the Assimilative Crimes Act.

21. The *Mayberry* decision, only recently reviewed by the district judges, has now been communicated to the United States Magistrates. If the present opinion is to be followed, it means that *Mayberry* may not be applied in certain types of cases but, since there is an exception in Virginia Code § 19.2–368.18 which excludes drunk driving, drunkenness, or disorderly conduct, the holding in *Mayberry* would apply if the assimilative crime is one of these excepted offenses.

22. Va.Code section 19.2–368.18 reads in full as follows:

A. There is hereby created by a special fund to be administered by the Comptroller,

*ry*, no punishment exists in state law similar to the federal assessments, and for that reason the special assessment cannot apply.

### III.  Conclusion and Disposition

The decision of the Magistrate is affirmed with respect to the fine of $250.00, the suspended sentence of incarceration, imposition of one year probation, and suspension of his driving privileges for six months.  For the reasons stated above, the special assessment of $25.00 is vacated.[23]

AFFIRMED IN PART; VACATED IN PART.

known as the Criminal Injuries Compensation Fund.

B.  Where any person is convicted, after July 1, 1976, of any crime of treason, felony, or of any offense punishable as a Class 1 or Class 2 misdemeanor under Title 18.2, except a violation of Article 2 (§ 18.2–266 et seq.), Chapter 7, of Title 18.2 or drunkenness or disorderly conduct, by any court with criminal jurisdiction, there shall be imposed an additional cost, in the case, in addition to any other costs required to be imposed by law, of the sum of fifteen dollars.  Such additional sum shall be paid over to the Comptroller to be deposited into the Criminal Injuries Compensation Fund.  Under no condition shall a political subdivision be held liable for the payment of this sum.

C.  No claim shall be accepted under the provisions of this chapter when the crime which gave rise to such claim occurred prior to July 1, 1977.

D.  Sums available in the Criminal Injuries Compensation Fund shall be used for the purpose of payment of the costs and expenses necessary for the administration of this chapter and for the payment of claims pursuant to this chapter.

E.  No claim shall be accepted by the Commission under this chapter until July 1, 1977.  All revenues deposited into the Criminal Injuries Compensation Fund, and appropriated for the purposes of this chapter, shall be immediately available for the payment of claims.  Va.Code § 19.2–368.18 (1983 & Supp.1985).

**23.**  The Magistrate did not act on a suggestion that Robertson be granted a restricted license to operate a motor vehicle for limited purposes under Virginia law.  Robertson elected to first appeal his conviction before pursuing this request.  Action on such request is not a part of the sentencing process and does not affect the finality of the conviction.  *Cf. United States v. Rowe,* 599 F.2d 1319 (4th Cir.1979).